523 A.2d 311

**COUNCIL OF MIDDLETOWN TOWNSHIP, DELAWARE COUNTY, Pennsylvania, Appellant,**

**v.**

**Alice S. BENHAM, Co-Executrix, and Mary Christine Moran, Co-Executrix of the Estate of Grant J. Benham, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 21, 1986.

Decided March 23, 1987.

Robert B. Surrick, Media, for appellant.

James P. Gannon, Media, for appellee.

Before NIX, C.J., and FLAHERTY, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

HUTCHINSON, Justice.

Appellant, the Council of Middletown Township, a second class township, appeals by allowance Commonwealth Court's order affirming a Delaware County Common Pleas order granting preliminary approval to appellee's planned residential development. This appeal presents two issues: (1) are all local zoning ordinances dealing with sewage and sewers invalid because of the General Assembly's preemption of the field through legislation, and (2) what does the

term "public sanitary sewer system" used in section 309.C.7 of the Middletown Township Zoning Ordinance mean. We hold that the legislature's enactment of the Pennsylvania Sewage Facilities Act [1] (Sewage Act) and the provisions of The Clean Streams Law [2] which deal with sewage systems have not wholly preempted these fields from local zoning regulation. We also hold that the term "public sanitary sewer system" in section 309.C.7 was not intended to limit "public sanitary sewer systems" to existing government owned systems when, as here, the government has no existing system and has no plans to provide one within the reasonable future. Accordingly, we affirm Commonwealth Court.

## I. *Facts*

Grant J. Benham, now deceased,[3] owned a 104.2 acre tract of land in Middletown Township, Delaware County. He wanted to develop the land for residential use.[4] In 1978 he submitted to the Township an application to build a Planned Residential Development consisting of thirty-one single family homes and eighty-two townhouses. Since the tract was not served by municipal sewage, the plan also included an on-site sewage plant to serve the community's needs. Following hearings, the Township denied the application on March 24, 1981.[5] The Council held that the plan did not comply with section 309.C.7 of the Township's zoning ordinance. That section provides:

1. Act of January 24, 1966, P.L. 1535 (1965), *as amended,* 35 P.S. §§ 750.1–750.20.

2. Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §§ 691.1–691.-1001.

3. On March 18, 1983, following appeal to Commonwealth Court but before the case was decided, Grant J. Benham died. His co-executrices were substituted as parties. They are the appellees in this action.

4. We note at the outset that this case involves the landowner/developer's rights, not rights of individuals denied housing. *Cf. Geiger v. Zoning Hearing Board,* 510 Pa. 231, 507 A.2d 361 (1986) (Hutchinson, J., concurring) (drawing the same distinction in an exclusionary zoning case).

5. The Township initially denied the application in October, 1979. Benham appealed to Delaware County Common Pleas. That court remanded the matter to Council for additional hearings.

> In order to qualify under this [zoning] Ordinance, the tract of land must be served by public water and public sanitary sewer systems.

Middletown Twp. Zoning Ordinance § 309.C.7. The Council held that a "public sanitary sewer system" must be municipally owned and no privately owned system is acceptable. The record shows that municipal sewer service is not likely to be extended to this area before the year 2000. Benham proposed several modifications to his plan to address the Township's concerns. These proposals included dedication of the on-site sewage facility to the Township, the Sewer Authority or any other body acceptable to the Township, ownership and operation of the facility by the Homeowner's Association, and joint public and private ownership and operation of the facility. All offers were refused.

Benham appealed to Delaware County Common Pleas. That court held that the term "public sanitary sewer system," not further defined in the ordinance, should be broadly interpreted. It then held that governmental ownership is not required and that the system proposed by Benham was a "public sanitary sewer system" because it provided sanitary sewers for the residents of the development and may be expanded to serve future adjoining developments. Alternately, Common Pleas held that the legislature had preempted the sewage field and the zoning ordinance itself was invalid.

Commonwealth Court affirmed, 91 Pa.Cmwlth. 186, 496 A.2d 1293. That court accepted appellant's interpretation that a "public sanitary sewer system" must be government owned. However, it agreed with Common Pleas that the field has been preempted by state legislation. Therefore, it held section 309.C.7 void.

## II. *Preemption*

■ We will address the preemption issue first. The state is not presumed to have preempted a field merely by legislating in it. The General Assembly must clearly show its intent to preempt a field in which it has legislated. *Retail Master Bakers Association v. Allegheny County,*

400 Pa. 1, 161 A.2d 36 (1960). *See also United Tavern Owners v. Philadelphia School District*, 441 Pa. 274, 272 A.2d 868 (1971) (Opinion Announcing the Judgment of the Court). The test for preemption in this Commonwealth is well established. Either the statute must state on its face that local legislation is forbidden, or "indicate[ ] an intention on the part of the legislature that it should not be supplemented by municipal bodies." *Western Pennsylvania Restaurant Association v. Pittsburgh*, 366 Pa. 374, 381, 77 A.2d 616, 620 (1951). *See also Harris-Walsh, Inc. v. Dickson City Borough*, 420 Pa. 259, 216 A.2d 329 (1966). If the General Assembly has preempted a field, the state has retained all regulatory and legislative power for itself and no local legislation is permitted. *Western Pennsylvania Restaurant Association, supra.*

■ Analyzing the Sewage Act, we believe that the legislature did not intend to preempt this field.[6] The Sewage Act does not state that municipal legislation is forbidden. Indeed, the Sewage Act actually incorporates it into the overall sewage regulation scheme. Section 8 of the Sewage Act[7] outlines the powers and duties of local agencies.[8] These local agencies are assigned the task of administering section 7 of the Sewage Act[9] dealing with sewage facility permits. Their specific tasks include inspecting facilities, enforcing and restraining violations of the Sewage Act, and setting and collecting fees from operators.[10] In addition, [a]ny other rules or regulations which the local agency deems necessary in order to administer and enforce sec-

6. Though certain provisions of The Clean Streams Law, *supra*, note 2, deal with sewage facilities, we do not believe that that law is germane to this preemption discussion. Those provisions deal with water pollution from sewage facilities, not with the construction and operation of sewage facilities.

7. Sewage Act, *supra* note 1 at § 8, *as amended*, 35 P.S. § 750.8.

8. A local agency, as defined in the Act, is a municipality or combination of municipalities, counties, or county departments of health. *Id.* at § 2, *as amended*, 35 P.S. § 750.2.

9. *Id.* at § 7, *as amended*, 35 P.S. § 750.7.

10. *Id.* at § 8(b), *as amended*, 35 P.S. § 750.8(b).

tion 7 may only be adopted if they are consistent with this act and the rules and regulations adopted hereunder.

Sewage Act, *supra* at § 8(b)(9), *as amended*, 35 P.S. § 750.8(b)(9). The Environmental Quality Board has included a similar provision in regulations it has established pursuant to the Sewage Act. 25 Pa.Code § 71.35. Instead of forbidding all municipal legislation on sewage facilities, the legislature has provided for it as an essential component of the statewide regulatory scheme. Reading the Sewage Act as a whole, we conclude that the legislature plainly intended to combine state and local power into a comprehensive regulatory scheme for sewage disposal.

A comparison with other situations in which we have held there was preemption makes this even clearer. We have found an intent to totally preempt local regulation in only three areas: alcoholic beverages, banking and anthracite strip mining.[11] In *Hilovsky Liquor License Case*, 379 Pa. 118, 108 A.2d 705 (1954), we held the legislature preempted the liquor field. The stated purpose of the Liquor Code is to

prohibit the manufacture of and transactions in liquor, alcohol and malt or brewed beverages which take place in this Commonwealth, except by and under the control of the board as herein specifically provided, and every section and provision of the act shall be construed accordingly.

Act of April 12, 1951, art. I, § 104, P.L. 90, *as amended*, 47 P.S. § 1–104.

The legislature articulated an intent to exercise complete control over all aspects of liquor manufacture, sale and

---

**11.** Members of this Court have expressed strong reservations about our extension of the preemption doctrine to preclude local taxation in the banking and liquor areas. *See Commonwealth v. Wilsbach Distributors, Inc.*, 513 Pa. 215, 519 A.2d 397 (1986) (Nix, C.J., concurring; Zappala, J., concurring; Flaherty, J., dissenting joined by Hutchinson, J.) (local taxation of a beer distributor); *Pittsburgh v. Allegheny Valley Bank*, 488 Pa. 544, 412 A.2d 1366 (1980) (Flaherty, J., concurring; Nix, J., dissenting) (local taxation of banking).

use.[12] The legislature has not expressed similar intent in the sewage field.

We have also held that the legislature has preempted the banking field by enacting the Banking Code of 1965 [13] and the Department of Banking Code.[14] *City of Pittsburgh v. Allegheny Valley Bank,* 488 Pa. 544, 412 A.2d 1366 (1980). In this area, commercial necessity presents a special need for uniformity. This was recognized even in medieval times by the common law's incorporation of the law merchant. *See* T. Plucknett, *A Concise History of the Common Law* 663–64 (5th ed. 1956). Consequently, we have held that "[t]hese Codes impose statutory requirements and standards upon virtually all aspects of banking." *Allegheny Valley Bank, supra,* 488 Pa. at 550, 412 A.2d at 1369.

> The Legislature established the Department of Banking to supervise the activities of state banking institutions.
>
> .    .    .    .    .
>
> [It] also granted broad supervisory power to the Department of Banking. The Department is charged with the responsibility of protecting the safety and soundness of all banking institutions.... In addition, the Department is legislatively directed to foster a "progressive" banking industry in this Commonwealth....

*Id.* (citations omitted). This scheme leaves no room for local legislation. *Id.,* 488 Pa. at 552, 412 A.2d at 1370.

In *Harris-Walsh, Inc., supra,* we held that the legislature expressly preempted the field of anthracite strip mining regulation by enacting the Anthracite Strip Mining and Conservation Act (Strip Mining Act).[15] The devastation caused in northeast Pennsylvania, in part, explains this

---

12. Needless to say, regulation of alcoholic beverages is *sui generis.* It followed repeal of prohibition and is intertwined with the intense social and political controversies connected with it.

13. Act of November 30, 1965, P.L. 847, *as amended,* 7 P.S. §§ 101–2204.

14. Act of May 15, 1933, P.L. 565, *as amended,* 71 P.S. §§ 733–1—733–1203.

15. Act of June 27, 1947, P.L. 1095, *as amended,* 52 P.S. §§ 681.1–681.-22.

.

legislative judgment. Local governments were historically unable to regulate their surface mining activities. Large integrated coal companies exercised overwhelming economic and political power throughout the region. The act states in relevant part:

> [a]ll coal stripping operations coming within the provisions of this act shall be within the *exclusive jurisdiction of the department* and shall be conducted in compliance with such reasonable rules and regulations as may be deemed necessary by the secretary.... The secretary ... shall have the authority and power to enforce the provisions of this act and the rules and regulations promulgated thereunder by him.

Strip Mining Act, *supra* at § 20.3, *as amended,* 52 P.S. § 681.20c (emphasis added). The language of this section plainly states an intent to preclude local legislative action in the field. *Harris-Walsh, Inc., supra* 420 Pa. at 274, 216 A.2d at 336. No such definite language is found in the Sewage Act.

Total preemption is the exception and not the rule. The Sewage Act matches the liquor and banking laws in neither tone of its language nor exhaustiveness of its scope. It does not contain the express preemption language of the Strip Mining Act either. Preemption would have to be implied. Such an implication is not natural considering the express sharing of regulatory power provided by the Sewage Act.

In addition, we have traditionally given local zoning power great play. We have been reluctant to strike down a local ordinance in cases where a state statute does not directly and inherently conflict with the zoning power. *See Commonwealth, Department of General Services v. Ogontz Area Neighbors Association,* 505 Pa. 614, 483 A.2d 448 (1984). We find no direct and inherent conflict with the Sewage Act here.

■ This does not mean that any or all ordinances dealing with sewage are *per se* valid. It is well established that even in the absence of preemption local ordinances which

conflict with state law are invalid. *Western Pennsylvania Restaurant Association v. Pittsburgh, supra* 366 Pa. at 381, 77 A.2d at 620; *Warren v. Philadelphia,* 382 Pa. 380, 385–86, 115 A.2d 218, 221 (1955) (city rent control ordinance does not conflict with state Landlord and Tenant Act). In addition, the sections of the Sewage Act cited above specifically forbid inconsistent local legislation. Therefore, the validity of this particular ordinance may depend on the meaning accorded the term "public sanitary sewer system."

## III. *Construction of Ordinance*

Though we have said the Statutory Construction Act, 1 Pa.C.S. §§ 1921–1939, is not expressly applicable to the construction of local ordinances, the principles contained therein should be followed. *Francis v. Corleto,* 418 Pa. 417, 426 n. 10, 211 A.2d 503, 507 n. 10 (1965). The objective of statutory construction is to determine the legislature's intent. Absent a contrary intent by the council, the words used in local ordinances, like statutes, should be given their plain meaning, *Bakerstown Container Corp. v. Richland Township,* 508 Pa. 628, 631, 500 A.2d 420, 421–22 (1985); *Shapiro v. Zoning Board of Adjustment,* 377 Pa. 621, 105 A.2d 299 (1954). The term "public sanitary sewer system" is not defined in the Middletown Township Zoning Ordinance. The word "public" can mean either government owned or serving and available to the general populace. Since both meanings are accepted and commonly used in everyday speech, the plain meaning approach does not resolve the problem. We must go beyond the words of the statute to define "public sanitary sewage system."

It is a longstanding rule that zoning ordinances should be strictly construed. *Exton Quarries, Inc. v. Zoning Board of Adjustment,* 425 Pa. 43, 49, 228 A.2d 169, 173–74 (1967); *Fidler v. Zoning Board of Adjustment,* 408 Pa. 260, 265, 182 A.2d 692, 695 (1962). *See also* 1 Pa.C.S. § 1928. Zoning ordinances are so construed because they are in derogation of common law and restrict the use of land. *Fidler, supra. See also Bakerstown Container Corp., supra.*

Somewhat paradoxically in the instant case, a strict construction will result from broadly defining "public sanitary sewer system." This is because the broad construction of the term will least restrict the owner's use of the land. Broadly construed, a "public sanitary sewer system" includes any system generally available to the public and need not be governmentally owned.[16]

In response, appellant argues that the ordinance shows on its face that the local legislature intended otherwise. He points to Chapter IV, article 2 of the Township's Code of Ordinances. That chapter deals with sewage facilities and contains sewage regulations.[17] Chapter IV, § 201(A)(10) states:

> *"Sewer System"* shall mean all facilities, as of any particular time, for collecting, pumping, transporting, treating and disposing of Sewage and Industrial Wastes, situate in or adjacent to this Township and owned, maintained and operated by the Authority or the Township.

In further support of its contention that the Council intended this definition of "sewer system" to apply to section 309.C.7, appellant refers to the Township's codification of its ordinances effective April 24, 1976. It argues that the re-enactment of these two provisions in connection with the codification implies an intent to generalize the Chapter IV definition of "sewer system" and incorporate it into the zoning ordinance.[18]

■ This argument is unpersuasive. In general, a codification is not intended to change the meaning of existing statutes unless a language change shows otherwise. There

16. *Cf.* Public Utility Code Section 102, *as amended,* 66 Pa.C.S. § 102. This section includes in its definition of public utility "[a]ny person or corporation now or hereinafter owning or operating in this Commonwealth equipment or facilities for ... (vii) Sewage collection, treatment or disposal for the public for compensation." This definition includes both public and private entities.

17. We note that the very existence of this chapter belies a total preemption.

18. We have assumed that the zoning ordinances were also codified. This is not clear from the parties' briefs. Only a scant few pages of the ordinances were provided for our use.

is no cross-reference in the local code between Chapter IV relating to sewers and the zoning provisions. It would create serious problems for persons affected by unrelated parts of a municipal code if we were to sanction such implied cross-definition. Had the Township defined "sewer system" in a general definition section, appellant's argument would have more force. The Township did not do so.

The ordinances themselves refute appellant's claim that the Council intended this construction of "public sanitary sewer system" in section 309.C.7. Section 309 of the zoning ordinance, providing for Planned Residential Development Districts, was in place as early as 1970. If the term "public sanitary sewer system" were redefined by the codifying ordinance, the prior zoning ordinance would have been repealed in effect. Section 103.P of the codifying ordinance, however, expressly states that the Township's pre-existing zoning ordinances were not impliedly repealed by the codification.

The unrepealed zoning ordinance sets forth the purposes for creating Planned Residential Development Districts in Section 309.A.

1. To respond to increasing urbanization and the growing demands for housing of various types and designs;

2. To encourage innovations in residential development and renewal so that the growing demand for housing may be met by greater variety in type, design and layout of dwellings and by the conservation and more efficient use of open space ancillary to said dwellings;

. . . .

4. *To encourage a more efficient use of land and of public services through private initiative.*

5. To insure that the increased flexibility of regulations over land development as authorized herein is carried out under such administrative standards and procedures as shall encourage the disposition of land development proposals without undue delay[.] (Emphasis supplied.)

The interpretation the Township urges is plainly inconsistent with purpose no. 4 and arguably does not further any of them.

Finally, this ordinance arguably exceeds the municipality's legislative authority. Under the Municipalities Planning Code,[19] the township is empowered to enact zoning ordinances

> [t]o promote, protect and facilitate one or more of the following: the public health, safety, morals, general welfare, ... [and] the provision[ ] of ... sewerage[.]

*Id.* at § 604(a), *as amended,* 53 P.S. § 10604(a). The adequacy of the sewage system would not be relevant if appellant's definition is accepted. Simple ownership then becomes all important.

■ We believe a local governmental unit may promote the public health or general welfare by requiring all persons to use its facilities for essential services in the interest of uniformity and of assuring their availability to everyone. *See Ridley Arms, Inc. v. Township of Ridley,* —— Pa. ——, 531 A.2d 414 (1987). Through the imposition and collection of reasonable users fees, the township can obtain the financing necessary to provide services to those who are not in an economic position to provide the required level of services for themselves. Otherwise, a large segment of the population could be deprived of essential services that would be supportable by user fees only if all residents are required to use them. Alternatively, the township residents might find themselves served by an inefficient patchwork of incompatible, separately financed, private services of varying quality.

■ However, if a municipality is to have a monopoly on the service, it must provide it in a reasonable manner. *See Ridley Arms, Inc., supra,* —— Pa. at —— - ——, 531 A.2d at 417–419. It may not refuse to provide an essential service and then prevent individuals from providing it for themselves. The township cannot have it both ways. Here, the

**19.** Act of July 31, 1968, P.L. 805, art. VI, *as amended,* 53 P.S. §§ 10601–19.

Township had no plans to extend public sewage service to the development in the near future, but rejected Benham's plan out of hand because the sewage facility was not municipally owned. It also ignored Benham's numerous offers to jointly operate the facility or dedicate it to public authority.

■ The township cannot preclude development by a zoning requirement that developers use non-existent municipal services. We have invalidated local legislative attempts to impede development through imposition of sewage requirements in zoning ordinances. *Concord Township Appeal,* 439 Pa. 466, 268 A.2d 765 (1970) (exclusionary zoning disguised as a sewage zoning ordinance). A municipality must take steps to provide the services or, alternatively, allow individuals to provide it for themselves. If it chooses the latter course, it can require the individual systems to adequately provide for the service in a manner consistent with the public health, welfare and safety, and the Sewage Act. To that end, it may set reasonable non-discriminatory specifications for facilities and conditions for private provision of essential services it is not in a position to provide currently or in the reasonably foreseeable future.

■ Zoning ordinances should be construed in a sensible manner to preserve their validity. *Archbishop O'Hara's Appeal,* 389 Pa. 35, 50 n. 5, 131 A.2d 587, 594 n. 5 (1957). Accordingly, appellant's "catch–22" construction is rejected. We hold that the term "public sanitary sewer system" in this ordinance refers to a sewer system generally available to the residents of an area. Therefore, appellee's plan does not violate section 309.C.7 of the Middletown Township Zoning Ordinance.

The order of Commonwealth Court is affirmed.

LARSEN and McDERMOTT, JJ., did not participate in the consideration or decision of this case.

PAPADAKOS, J., concurs in the result.