615 A.2d 938

**Ernest REIMER, Appellant,**

v.

**The BOARD OF SUPERVISORS OF UPPER MOUNT BETHEL TOWNSHIP, Appellee.**

Commonwealth Court of Pennsylvania.

Argued June 16, 1992.

Decided Sept. 2, 1992.

324

Joseph P. McDonald, Jr., for appellant.

David M. Backenstoe, for appellee.

Before SMITH and KELLEY, JJ., and LORD, Senior Judge.

KELLEY, Judge.

Ernst Reimer appeals from an order of the Court of Common Pleas of Northampton County (trial court) which affirmed an order of the Board of Supervisors of Upper Mount Bethel Township (board) denying Reimer's validity challenge and proposed curative amendment to a township ordinance.

Reimer is the owner of a 15.37 acre tract, located in an area of the township zoned AR—Agriculture–Rural. The minimum lot size in the Agriculture–Rural zone is three acres. In 1989, Reimer submitted a proposed six-lot subdivision plan which was rejected by the township as not conforming to the zoning ordinance. The plan sought to create six building lots ranging in size from 1.23 to 6.50 acres each.

Following the rejection of the subdivision proposal, Reimer filed a validity challenge alleging that the ordinance exceeded the township's police power, was exclusionary, violated the uniformity requirement of the Pennsylvania Municipalities Planning Code (MPC) [1] and was preempted by the Pennsylvania Sewage Facilities Act (SFA).[2] Reimer also submitted a proposed curative amendment. The board rejected the pro-

1. Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§ 10101–11201.
2. Act of January 24, 1966, P.L. (1965) 1535, *as amended,* 35 P.S. §§ 750.1–750.20a.

posed curative amendment and upheld the ordinance. The trial court affirmed without taking additional evidence.

Because our research has not revealed any prior review by a Pennsylvania appellate court of an ordinance of the type at issue in this case, a somewhat detailed discussion of the mechanics of the ordinance is appropriate.

Section 3.106 of the ordinance provides as follows:

3.106 'The lot size set forth in each zone district is the minimum lot size permitted, and such lot size shall be increased, and the maximum tract density shall be determined, by applying the following density adjustment factors to the tract of land sought to be subdivided and to each individual lot sought to be created

DENSITY FACTOR

| | ON-SITE WATER & SEWER | CENTRAL WATER | CENTRAL SEWER | CENTRAL WATER & SEWER |
|---|---|---|---|---|
| SLOPES 25% OR MORE | 0.33 | 0.33 | 0.33 | 0.33 |
| SLOPES 15–24% DEEP SOILS | 0.50 | 0.50 | 0.50 | 0.50 |
| SEASONAL HIGH WATER TABLE AT SURFACE | 0.20 | 0.20 | 0.20 | 0.20 |
| SEASONAL HIGH WATER TABLE, 1' TO 3' | 0.33 | 0.33 | 1.0 | 1.0 |
| SHALLOW DEPTH BEDROCK 0 TO 3½' | 0.33 | 0.33 | 1.0 | 1.0 |
| DEPTH TO BEDROCK, 3½' OR MORE | 1.0 | 1.0 | 1.0 | 1.0 |
| FLOODPLAIN & WETLANDS | 0 | 0 | 0 | 0 |

'In calculating the maximum tract density, using the appropriate density factor as determined from the constraints which appear on the plats submitted in accordance with the requirments, [sic] the subdivider in designing the proposed land subdivision shall determine the maximum allowable density on such tract. After calculating the number of acres subject to each constraint which imposes maximum tract density and minimum lot size, as listed above, the number of acres is multiplied by that density factor to determine the maximum number of permissible lots subject to such constraint. After calculating the total number of lots for each category, the total of these categories will yield the maximum number of

permissible lots on a particular tract; and, therefore, the maximum density.'

Reproduced Record—Supplement at 38a.

The board, in its findings of fact, made the following observations as to the application of Section 3.106:

6. Reimer's proposed subdivision is located in the Agriculture–Rural Zoning District under the Township Zoning Ordinance. The minimum lot size in the Agriculture–Rural Zoning District is 3 acres.

7. Other than the Agriculture–Rural Zoning District, there are three other residential zoning districts under the Township Zoning Ordinance: R–1, R–2 and R–3. The minimum lot size in the R–1, R–2 and R–3 Zoning Districts is 1 acre.

8. Section 3.106, known as the 'one good acre' Section of the Township Zoning Ordinance, applies to all of the zoning districts under the Township Zoning Ordinance. Section 3.106 provides adjustment factors which apply to and increase the minimum lot size in each zoning district based on the nature and character of the land under consideration and based on the type of water and sewer system proposed.

9. The plan for the Reimer subdivision includes a total of 6 lots. The Reimer subdivision plan was rejected by the Township in that the application of the density adjustment factors in Section 3.106 only permit [sic] the development of 3 lots in the Reimer subdivision.

. . . .

14. Section 3.106 requires following a mathematical formula: The permitted density in each zoning district is attained by multiplying the minimum lot size by the number indicated for each density adjustment factor which applied (e.g. a one acre lot in the R–1 zoning district would be insufficiently sized for the erection of a residence in the event that the depth to bedrock was less than 42 inches; after the application of the density adjustment factor the lot size would be .33 acre (1 acre X .33) and would not constitute 'one good acre').

■ We must first note that this case was brought as a validity challenge pursuant to section 916.1 of MPC, 53 P.S. § 10916.1.³ Because the challenged ordinance concerned a subdivision, the challenge was heard by the governing body, *i.e.,* the board, pursuant to section 909.1 of the MPC, 53 P.S. § 10909.1, together with a request for a curative amendment under section 609.1 of the MPC, 53 P.S. § 10609.1. The specific application of the ordinance to Reimer's proposed subdivision is therefore not before us. Where, as here, the trial court has not taken additional evidence, our scope of review is limited to a determination of whether the board committed a manifest abuse of discretion or an error of law. *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 462 A.2d 637 (1983).

## MINIMUM LOT SIZE

■ Reimer first argues that the minimum lot sizes required by section 3.106 of the ordinance exceed the township's police power as they do not further a legitimate public interest. As we stated in *Mill Valley Associates v. Zoning Hearing Board,* 126 Pa.Commonwealth Ct. 340, 559 A.2d 985 (1989), zoning for density is a legitimate exercise of the police power. It is therefore impossible to say that any minimum lot requirement is unconstitutional per se. *Id.* at 343, 559 A.2d at 986 (citing *National Land and Investment Company v. Easttown Township Board of Adjustment,* 419 Pa. 504, 523, 215 A.2d 597, 608 (1965). Rather, the constitutionality of minimum lot size requirements must be determined on a case-by-case basis. *Id.*

■ We have held that minimum lot sizes in excess of one acre can be upheld only in the face of "extraordinary justification related to the public interest." *Martin v. Township of Millcreek,* 50 Pa.Commonwealth Ct. 249, 413 A.2d 764 (1980). In the present case, the board found that "[t]he intent of Section 3.106 was to make lots large enough to sustain the dwelling along with the necessary sewerage and water system, and to protect adjoining lot owners and ground water in

3. Section 916.1 was added by the Act of December 21, 1988, P.L. 1329.

general from pollution and contamination due to sewerage and/or water problems." Board's Finding of Fact No. 16. We believe that such a finding constitutes the type of "extraordinary justification" necessary to support carefully tailored increased minimum lot sizes.

In *Mill Valley Associates*, a township sought to impose a 2½ acre minimum lot size based on the peculiar characteristics of the limestone formations in the area. According to the township, development at a greater density could cause adverse environmental effects, including the formation of sinkholes, disappearing streams, etc. We first noted that the zoning hearing board had made no finding that any minimum lot size would diminish the potential adverse effects of development in the area. Additionally, the "blanket" large lot requirement in *Mill Valley Associates* was disapproved by this court because the Zoning hearing board in that case had recognized that site suitability for on-site sewerage systems varied on each lot, but went on to impose an invariable minimum lot size. Commenting on this contradiction, Judge Barry noted that:

> [T]his finding tends to support a determination *against* any specific lot size requirement. The finding specifically states that the appropriateness of on-site sewage systems with respect to the limitations present in limestone formations is variable as to each lot. Such a finding cannot provide support for a conclusion that a minimum lot size requirement of 2½ acres is necessary for on-site sewage systems. . . .

*Mill Valley Associates*, 126 Pa.Commonwealth Ct. at 345, 559 A.2d at 987–88.

█ Contrary to the facts in *Mill Valley Associates*, the board in this case has determined that larger lots are necessary to diminish the potential adverse effects of development in areas with specific slopes, types of soil and water conditions. As the conditions vary from lot to lot, the minimum lot size varies accordingly. Therefore, we conclude that the ordinance is reasonably related to a legitimate public interest. Because the ordinance is tailored so that it burdens only those lots

exhibiting these specific conditions, it furthers this interest and does not exceed the township's police power.

## EXCLUSIONARY ZONING

Reimer next argues that the effect of the ordinance is to preclude the development of single-family residences with on-site sewage facilities in violation of the mandates of our Supreme Court in *Surrick v. Zoning Hearing Board of Upper Providence Township*, 476 Pa. 182, 382 A.2d 105 (1977) and *Fernley v. Board of Supervisors of Schuylkill Township*, 509 Pa. 413, 502 A.2d 585 (1985).

■ An ordinance which totally excludes a basic housing form is unconstitutional. *Fernley.* Where, however, a basic form of housing is only partially excluded, the reviewing court must apply a "fair share" analysis. *Surrick.*[4] In the present case, the trial court questioned whether "one dwelling unit per acre housing, with individual on-site sewage facilities" is "an identifiable and protected form of housing." Because we believe that it is not, we conclude that neither *Fernley* nor *Surrick* is applicable.

In *Surrick* itself, the Supreme Court found that the ordinance unconstitutionally restricted the building of multi-family dwellings, identified as a basic form of housing. Subsequently, considerable litigation has resulted concerning whether specific types of multi-family dwellings constitute "basic forms of housing." *See, e.g., Appeal of M.A. Kravitz Co., Inc.*, 501 Pa. 200, 460 A.2d 1075 (1983); *H & R Builders, Inc., v. Borough Council, Norwood*, 124 Pa.Commonwealth Ct. 88, 555 A.2d 948 (1989); *Board of Supervisors, Northampton Township v. Gentsch*, 51 Pa.Commonwealth Ct. 455, 414 A.2d 1102 (1980).

---

4. In *Surrick,* our Supreme Court held that a municipality located in the path of development could not isolate itself and ignore the housing needs of the areas surrounding it. Therefore, the municipality must make a provision for each basic housing type, but must ensure that the area allocated is sufficient to provide its "fair share" of basic housing types to meet the needs of all categories of people who may desire to live within its boundaries.

■ Neither mobile homes nor mobile home parks may be totally excluded or, subject to a "fair share" analysis, unduly restricted by an ordinance. *See, e.g., Geiger v. Zoning Hearing Board,* 510 Pa. 231, 507 A.2d 361 (1986); *Borough of Malvern v. Jackson,* 108 Pa.Commonwealth Ct. 248, 529 A.2d 96 (1987); *Shore Appeal,* 107 Pa.Commonwealth Ct. 522, 528 A.2d 1045 (1987), *aff'd as modified,* 524 Pa. 436, 573 A.2d 1011 (1990). Although there are numerous published decisions applying both the *Fernley* and *Surrick* analysis to various types of multi-family dwellings and to mobile homes, both individually and in parks, our research has not uncovered any decision distinguishing between various types of single-family dwellings, as Reimer argues here. We find, however, that our task has been made considerably easier by recent amendments to the MPC, which now define what constitutes "basic forms of housing." Section 604 of the MPC, 53 P.S. § 10604 provides as follows: [5]

The provisions of zoning ordinances shall be designed:

(4) To provide for the use of land within the municipality for residential housing of various dwelling types encompassing all basic forms of housing, including single-family and two-family dwellings, and a reasonable range of multifamily dwellings in various arrangements, mobile homes and mobile home parks, *provided, however, that no zoning ordinance shall be deemed invalid for the failure to provide for any other specific dwelling type.* (Emphasis added.)

The amended version of section 604, therefore, recognizes five "basic forms of housing," among them "single-family dwellings." The proviso of section 604, however, expressly states that no ordinance shall be deemed invalid for the failure to provide for any other specific dwelling type. It is undisputed in the present case that the ordinance makes ample provision for "single-family dwellings." Even were we to accept Reimer's argument that a single-family dwelling with an individual on-site septic system on one acre of land constitutes an identifiable form of housing, such a finding would not be a

5. Section 604 was reenacted and amended by the Act of December 21, 1988, P.L. 1329, effective in 60 days.

basis for invalidating the ordinance. Because the ordinance does not exclude, entirely or partially, any of the "basic forms of housing" identified in section 604, we conclude that neither the *Surrick* nor *Fernley* analysis are applicable in the present case.

## UNIFORMITY REQUIREMENTS

Reimer next contends that the ordinance violates the uniformity requirements of Section 605 of the MPC, 53 P.S. § 10605 in that the "depth to bedrock" and "seasonal high-water table" factors utilized by the ordinance result in non-uniform lot sizes within a given zoning district and are not specifically excepted by section 605.

Section 605 of the MPC provides that:

Where zoning districts are created, all provisions shall be uniform for each class of uses or structures, within each district, except that additional classifications may be made within any district:

. . . .

(2) For the regulation, restriction or prohibition of uses and structures at, along or near:

(i) major thoroughfares, their intersections and interchanges, transportation arteries and rail or transit terminals;

(ii) natural or artificial bodies of water, boat docks and related facilities;

(iii) places of relatively steep slope or grade, or other areas of hazardous geological or topographic features;

(iv) public buildings and public grounds;

(v) aircraft, helicopter, rocket and spacecraft facilities;

(vi) places having unique historical, architectural or patriotic interest or value; or

(vii) flood plain areas, agricultural areas, sanitary landfills, and other places having a special character or use affecting and affected by their surroundings.

53 P.S. § 10605.

The trial court found that the "depth to bedrock" and "seasonal high water" factors utilized in the ordinance consti-

tuted "hazardous geological or topographic features," as contemplated by section 605(2)(iii). Reimer now argues that the trial court's finding is unsupported by substantial evidence of record and must be reversed. We disagree.

Reimer cites expert testimony to the effect that the term "hazardous geological condition" refers to such things as faults, sinkholes and other natural conditions which might cause landslides, earthquakes or subsidence. Even accepting this restrictive definition, we note that section 605(2)(iii) excepts "hazardous geologic *or topographic* features." The MPC does not define "topographic features"; accordingly, the term must be construed according to its common and approved usage. 1 Pa.C.S. § 1903; *Derry Township v. Swartz*, 21 Pa.Commonwealth Ct. 587, 346 A.2d 853 (1975).

 Webster's Third New International Dictionary defines "topography" as "the configuration of a surface including its relief and the position of its natural and man-made features." Webster's Third New International Dictionary at 2411 (1966). We believe that factors such as depth to bedrock and location of seasonal high water table may properly be categorized as part of the "configuration of a surface" so as to constitute "topographical features" within the meaning of section 605(2)(iii). Furthermore, the features need not present the possibility of a cataclysm such as an earthquake or a landslide in order to be "hazardous." The board found that:

17. The depth to bedrock and reasonable [seasonal] high water table are used as density adjustment factor [sic] since the presence of these constraints directly affects the transmission of sewerage effluent. A seasonable [seasonal] high water table at a depth of less than 3 feet and a depth to bedrock of less than 3½ feet increase the probability that the sewerage effluent will disperse into the water table and pollute the water system.

18. A seasonable [seasonal] high water table at a depth of less than 3 feet and a depth of [sic] bedrock of less than 3½ feet constitute geological or topographical hazards. The presence of a particularly high water table can result in the cracking of structural foundations from repeated freezing

and thawing of water in or below the basement. The cracking of structural foundations may also occur in the event that shallow depth to bedrock produces differential settlement.

Even if we were to find that the depth to bedrock and seasonal high water table factors were not "geological" or "topographical" features, we note that the use of these factors could still be sustained under section 605(2)(vii), as "other places having a special character or use affecting and affected by their surroundings."

 Nor is it fatal to the uniformity requirement that the ultimate result is to produce lots which are not of uniform size. Section 605 does not, as Reimer suggests, mandate that lot size be uniform within a district; it merely requires that the *provisions* of the ordinance be uniformly applied. Under the ordinance at issue in the present case, the provisions are applied with strict uniformity throughout all of the residential zoning districts of the township.[6] Accordingly, we conclude that the performance zoning factors of the ordinance do not violate the uniformity requirement of section 605 of the MPC.

## PREEMPTION

 Finally, Reimer argues that the ordinance is an invalid attempt to impose upon landowners on-site sewage requirements which are more restrictive than those set forth in The Clean Streams Law[7] and SFA. We have held that the enactment of the SFA "resulted in a limited preemption of the field of regulation of sewage operations." *Greater Greensburg*

---

6. The purpose of the uniformity requirement, which is similar to that contained in the Standard State Zoning Enabling Act, was to ensure potentially hostile landowners that all property which was similarly situated would be treated alike. Robert M. Anderson, Law of Zoning in Pennsylvania § 5.19 (1982) (citing Edward M. Bassett, Zoning 50 (1940)). The performance factors of the ordinance now before us accomplish this purpose, as they treat alike all property which is similarly situated.

7. Act of June 22, 1937, P.L.1987, *as amended,* 35 P.S. §§ 691.1– 691.1001.

*Sewage Authority v. Hempfield Township,* 5 Pa.Commonwealth Ct. 495, 501, 291 A.2d 318, 321 (1972).

In *Middletown Township v. Benham,* 91 Pa.Commonwealth Ct. 186, 496 A.2d 1293 (1985), *aff'd* 514 Pa. 176, 523 A.2d 311 (1987), we considered an ordinance which required planned residential developments to be served by "public sanitary sewer systems." Because the ordinance sought "to control the type of sewage system, without reference to the state program which entirely embraces the determination of proper type," we held that the ordinance was void as preempted by state law. *Id.* at 192, 496 A.2d at 1296–97. More recently, we stated unequivocally that a zoning hearing board does not have jurisdiction to decide the type of sewage system to be installed so long as the method was approved by the Department of Environmental Resources (DER). *Stewart v. Zoning Hearing Board, Radnor Township,* 110 Pa.Commonwealth Ct. 111, 531 A.2d 1180 (1987), *petition for allowance of appeal denied,* 521 Pa. 615, 557 A.2d 346 (1989).

Section 3.106 of the ordinance utilizes shallow depth to bedrock as a density factor if the lot is not served by central sewer. Shallow depth is defined as 0 to 3½ feet. Regulations promulgated by DER pursuant to the authority of the SFA and The Clean Streams Law mandate that no sewage permit shall be issued where a "limiting zone" is found within 20 inches of the "mineral soil" surface.[8] 25 Pa.Code § 73.14. Reimer now argues that the "depth to bedrock" factor is

---

8. 25 Pa.Code § 73.1 provides the following definitions:

*Limiting Zone*—A horizon or condition in the soil profile or underlying strata which includes:

(i) A seasonal high water table, whether perched or regional, determined by direct observation of the water table or indicated by soil mottling.

(ii) Rock with open joints, fractures or solution channels, or masses of loose rock fragments, including gravel, with insufficient fine soil to fill the voids between the fragments.

(iii) Rock formation, other stratum or soil condition which is so slowly permeable that it effectively limits downward passage of effluent.

. . . .

*Mineral Soil*—A soil, excluding the natural organic layers of the surface, consisting of naturally occurring mineral matter with organic materials not exceeding 20% by weight.

merely a means of supplementing or augmenting DER's technical requirements for on-site sewage disposal systems, which is impermissible under *Middletown Township*. We disagree.

Contrary to the type of ordinance invalidated in *Middletown Township*, section 3.106 does not attempt to regulate the type of sewage system, nor does it purport to set forth requirements for the installation of sewage. The ordinance merely employs "depth to bedrock" and "seasonal high water table" factors to determine density of development, which we have concluded is rationally related to a legitimate public interest. As the trial court recognized, section 3.106 does not directly address sewage at all, but merely controls the size of the lot on which installation may occur.

More important, however, is the fact that while our Supreme Court affirmed this court's holding in *Middletown Township*, it did so on different grounds. Following an extensive discussion of the limited situations in which state law had totally preempted local legislation,[9] the Supreme Court found *no direct and inherent conflict between the local ordinance and the Pennsylvania Sewage Facilities Act. Council of Middletown Township v. Benham,* 514 Pa. 176, 184, 523 A.2d 311, 315 (1987). Instead, the Supreme Court affirmed this court based on its expansive reading of the term "public sanitary sewer system," thereby concluding that the proposed system complied with the ordinance.

Like the Supreme Court in *Middletown Township.*, we conclude that section 3.106 of the ordinance here is not in direct or inherent conflict with either The Clean Streams Law or the SFA. Accordingly, we affirm the order of the Court of Common Pleas of Northampton County.

## ORDER

NOW, this 2nd day of September, 1992, the order of the Court of Common Pleas of Northampton County, dated October 25, 1991, at No. 1991–C–2910, is affirmed.

---

9. The Supreme Court noted that total preemption had been found in only three areas: alcoholic beverages, banking and anthracite strip mining. *Council of Middletown Township v. Benham,* 514 Pa. 176, 182, 523 A.2d 311, 314 (1987).