**Keith HARVIN and Harvin Properties, LLC**

v.

**The BOARD OF COMMISSIONERS OF UPPER CHICHESTER TOWNSHIP, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Oct. 18, 2011.
Decided Dec. 2, 2011.
Reargument Denied Jan. 17, 2012.

Howard J. Gallagher, III, Media, for appellant.

Michael P. Dignazio, Media, for appellees.

BEFORE: LEADBETTER, President Judge, and BROBSON, Judge, and KELLEY, Senior Judge.

OPINION BY Senior Judge KELLEY.

The Board of Commissioners (Board) of Upper Chichester Township (Township) appeals the order of the Court of Common Pleas of Delaware County (trial court) granting the appeal of Keith Harvin and Harvin Properties, LLC (Applicant) of the Board's decision denying Landowner's Application for Tentative Plan Approval (Application) of a Subdivision and Land Development Plan (Plan), and directing that the Plan may proceed as if approved subject to a number of conditions. We reverse the trial court's order and reinstate the Board's decision.

Applicant is the owner of a 4.22–acre parcel located in the R–1 Low Density Residential zoning district of the Township. On March 8, 2007, the Township enacted a Zoning Ordinance creating a new Planned Residential District II (PRD II) as a permitted use in the R–1 zoning district.[1] On January 18, 2008, Applicant submitted the Plan to the Township for Boothwyn Estates, a PRD II housing development comprised of four twin homes and twenty-three townhomes. See Exhibit A–2. Hearings were conducted before the Board on May 1, 2008, May 29, 2008, and July 10, 2008 on the Plan. On July 10, 2008, Applicant submitted the formal Application of the PRD II Plan.[2] See RR at 177a–194a.

---

1. Section 1203B of the Zoning Ordinance permits the PRD II use in the R–1 zoning district, and Section 1204B provides that only single-family detached, semi-detached (twin), and attached (townhouse) dwellings are PRD II uses permitted by right. Reproduced Record (RR) at 255a.

2. Section 707 of the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, as amended, 53 P.S. § 10707, provides, in pertinent part:

   In order to provide an expeditious method for processing a development plan for a planned residential development under the provisions adopted pursuant to the powers granted herein, and to avoid the delay and uncertainty which would arise if it were necessary to secure approval, by a multiplicity of local procedures, of a plat of subdivision as well as approval of a change in the zoning regulations otherwise applicable to the property, it is hereby declared to be in the public interest that all procedures with respect to the approval or disapproval of a development plan for a planned residential development and the continuing administration thereof shall be consistent with the following provisions:

   *   *   *

   (3) All planning, zoning and subdivision matters relating to the platting, use and development of the planned residential development and subsequent modifications of the regulations relating thereto, to the extent such modification is vested in the municipality, shall be determined and established by the governing body or the planning agency

   (4) The provisions shall require only such information in the application as is reason-

The Plan as submitted shows a street with a right-of-way of 50 feet and a cartway of 24 feet. *See* Exhibit A–2. At the hearings, Applicant intended to submit an amendment to the Plan to conform to the Township's cartway requirement of 34 feet. *See* RR at 127a–128a. However, no such amendment was submitted to the Township.

The open space provided for in the Plan consists of 1.17 acres. *See* Exhibit A–2; RR at 137a.[3] Applicant's engineer conceded that the property is not wide enough to provide recreational passive type of open space, and the limited area provided will be heavily landscaped with evergreen buffer trees. *Id.* at 145a. Applicant's

counsel indicated that the use is limited by the location of a detention basin in the open space. *Id.* at 150a. Applicant's engineer also acknowledged that the open space would not be suitable for recreation due to the length and depth of the property and the width provided. *Id.* at 39a–42a.

In addition, the Plan specifically provided that it "[i]s subject to the review of the Fire Marshall. . . ." Exhibit A–2. The Fire Marshall requested an emergency access road. RR at 30a–31a. No emergency access is provided in the Plan, and no amendment providing for such emergency access was submitted to the Township.

On September 2, 2008, the Board issued a decision denying Applicant's application.[4]

---

ably necessary to disclose to the governing body and the planning agency:
  (i) the location, size and topography of the site . . .;

        *       *       *

  (iii) the location and size of the common open space and the form of organization proposed to own and maintain the common open space;
  (iv) the use and the approximate height, bulk and location of buildings and other structures;
  (v) the feasibility of proposals for water supply and the disposition of sanitary waste and storm water;

        *       *       *

  (vii) the provisions for parking of vehicles and the location and width of proposed streets and public ways;
  (viii) the required modifications in the municipal land use regulations otherwise applicable to the subject property. . . .
53 P.S. § 10707(3), (4).

3. Section 1208B of the Zoning Ordinance provides, in pertinent part:
    In this Section, the term "open space" shall be construed to mean "common open space" as defined in Appendix 1
    1.  General Regulations
    Subject to Section 12[12.1] of the PRD district.
    2.  Common Open Space Standards
    a.  A minimum of twenty-five (25) percent of the gross tract area shall be devoted to common open space. . . .

RR at 257a. In turn, Section 1212.1.b. of the Zoning Ordinance provides that "[o]pen space areas shall contain no major structures other than those related to the purpose of the open space." *Id.* at 270a.
    In addition, Appendix I.B. of the Zoning Ordinance defines "open space" as "[s]ee Common Open Space." Zoning Ordinance Appendix I.B. at I–8. Appendix I.B. defines "common open space" as:
        A parcel or parcels of land or an area of water, or a combination of land and water within a land development or subdivision, designed and intended for the use and enjoyment of residents or occupants thereof, not including streets, off-street parking areas and areas set aside for public facilities.
*Id.* at I–2. Moreover, Appendix I.A. of the Zoning Ordinance provides that "[t]erms not defined herein shall have the meaning customarily assigned to them." *Id.* at I–1.

4. Section 709(b) of the MPC provides, in pertinent part:
        (b) The grant or denial of tentative approval by official written communication shall include not only conclusions of law but also findings of fact related to the specific proposal and shall set forth the reasons for the grant, with or without conditions, or for the denial, and said communication shall set forth with particularity in what respects the development plan would or would not be in the public interest, including, but not limited to,

The Board concluded, *inter alia*, that Applicant failed to demonstrate compliance with the minimum cartway width, the minimum open space, and the provision of public service in the form of emergency access as required by the Zoning Ordinance.[5] *See* Board Decision at 5–9.

More specifically, with respect to the open space requirement, the Board determined that of the 1.17 acres of open space on the Plan: (1) 0.61 acres of the area consist of buffer areas along the western and eastern boundaries of the parcel that contain two rows of evergreen plantings and several above ground storm management features such as "rain gardens"; (2) 0.18 acres of the area consist of above ground stormwater management facilities; and (3) 0.11 acres of the area consist of below ground stormwater management features that may restrict the installation of above ground features. Board Decision at 6–7. In addition, the Board determined that the Plan does not: have community "greens"; incorporate large existing trees into the open space; integrate the sidewalk system into the open space; use trails, picnic tables, and play apparatus into the open space. *Id.* at 7. Moreover, the Board determined that the definition of "common open space" in the Zoning Ordinance excludes "areas set aside for public facilities" and, as a result, there is insufficient open space in the Plan. *Id.*

◼ On September 29, 2008, Applicant appealed the Board's decision to the trial court. On June 3, 2010, the trial court issued an order: (1) granting Applicant's appeal; (2) stating that Applicant's Tentative Approval Plan could proceed as if approved subject to a number of conditions[6]; and (3) remanding the matter back

findings of fact and conclusions on the following:

\* \* \*

(2) the extent to which the development plan departs from zoning and subdivision regulations otherwise applicable to the subject property, including but not limited to density, bulk and use, and the reasons why such departures are or are not deemed to be in the public interest;

(3) the purpose, location and amount of the common open space in the planned residential development, the reliability of the proposals for maintenance and conservation of the common open space, and the adequacy or inadequacy of the amount and purpose of the common open space as related to the proposed density and type of residential development;

(4) the physical design of the development plan and the manner in which said design does or does not make adequate provision for public services....

53 P.S. § 10709(b)(2), (3), (4).

5. Section 1211B.12 of the Zoning Ordinance provides that "[d]evelopment shall also comply with Sections ... 12[11.4], Stormwater Control ... and 12[11.6], Streets and Walkways." RR 260a. In turn, Section 1211.4 provides, in pertinent part:

a. The storm drainage system for a PRD shall be designed and constructed so as to minimize erosion and flooding, using as necessary drainage easements, swales, catchment basins, silt traps and the design of cartways so as to minimize runoff.

\* \* \*

e. The design and construction of all storm drainage facilities and stormwater systems shall be subject to the approval of the Township Engineer.

f. All stormwater control and management facilities shall be designed in accordance with Township Ordinance No. 473.

*Id.* at 268a–269a. In addition, 1211.6.c of the Zoning Ordinance provides that "[t]he design and construction of streets must conform to the standards set forth in the [Township's] Subdivision and Land Development Ordinance relative to paving specifications, cartway design, horizontal and vertical alignment, sight distances and the like." *Id.* at 269a.

6. The trial court's order stated that Applicant could proceed as if the Plan were approved if Applicant: (1) within 30 days, secure and file with the Township a letter signed by an officer of each company supplying water and sewer services to the site assuring the avail-

to the Township for further action not inconsistent with the opinion. The Board then filed the instant appeal from the trial court's order.[7]

In this appeal, the Board claims that the trial court erred in granting Applicant's appeal and directing that the Plan proceed as if approved subject to the conditions. More specifically, the Board contends that: (1) it did not err or abuse its discretion in denying the Application; (2) its findings in the decision denying the Application are supported by substantial evidence; (3) there were multiple substantive plan deficiencies and discrepancies in the Application that are required by the Township's Zoning Ordinance and the MPC; and (4) the trial court's decision is arbitrary, capricious, and irrational.

The Board first claims that the trial court erred in granting Applicant's appeal and directing that the Plan proceed as if approved subject to the conditions because it did not err or abuse its discretion in denying the Application. We agree.

■ An application for tentative approval must be approved if the plan complies with all objective provisions of the applica-

ble ordinance as well as all other applicable regulations. *Robal Associates, Inc. v. Board of Supervisors of Charlestown Township*, 999 A.2d 630 (Pa.Cmwlth.2010). However, the rejection of a plan will be affirmed by this Court if it is validly supported by only one of several objections to a substantive and objective requirement. *Id.*

As noted above, Section 1208B.2.a. of the Zoning Ordinance provides that "[a] minimum of twenty-five (25) percent of the gross tract area shall be devoted to common open space." RR at 257a. The foregoing minimum open space requirement is an objective requirement because it provides a sufficient standard, a simple ratio, by which to judge compliance. *Robal Associates, Inc.* In addition, the foregoing minimum open space requirement is substantive because it relates to a minimum area. *Id.* As a result, the Board's rejection of the Plan is valid if the objective and substantive minimum open space requirement of Section 1208B.2.a. is not met. *Id.*

Section 1211B.12 of the Zoning Ordinance provides that, in the PRD II Zoning

---

ability of a safe and efficient public water supply as well as public sewer facilities as set forth in the Zoning Ordinance; (2) within 30 days, secure and file with the Township a topographic map showing the contours of the slopes as set forth in the Zoning Ordinance; (3) within 30 days, secure and file a revised plan addressing the additional trees to be placed alongside the adjacent property and north of the detention basin; (4) within 30 days, secure and file with the Township a revised plan reflecting a cartway, 34 feet in width; (5) within 90 days, secure and file with the Township a traffic assessment, especially as it relates to ingress and egress from the proposed development onto Chichester Avenue, and any changes in the Plans based upon the assessment must be submitted within 30 days of the submission of the assessment; and (6) complies with all applicable state regulations regarding sewage facilities requirements, including the potential for

identifying and conserving cultural resources and preserving items of archaeological or historical significance.

7. Where, as here, the trial court took no additional evidence, this Court's scope of review is limited to determining whether the Board abused its discretion or committed an error of law. *Kassouf v. Township of Scott*, 584 Pa. 219, 883 A.2d 463 (2005); *Dream Mile Club, Inc. v. Tobyhanna Township Board of Supervisors*, 150 Pa.Cmwlth. 309, 615 A.2d 931 (1992); *Board of Supervisors of Charlestown Township v. West Chestnut Realty Corp.*, 110 Pa.Cmwlth. 481, 532 A.2d 942 (1987), *petition for allowance of appeal denied*, 519 Pa. 657, 546 A.2d 61 (1988); *Council of Middletown Township v. Benham*, 91 Pa.Cmwlth. 186, 496 A.2d 1293 (1985), *aff'd*, 514 Pa. 176, 523 A.2d 311 (1987).

District, "[d]evelopment shall also comply with Sections ... 12[11.4], Stormwater Control...." RR at 259a. In turn, Section 1211.4.e. and f. provides that "[t]he design and construction of all storm drainage facilities and stormwater systems shall be subject to the approval of the Township Engineer ...", and that "[a]ll stormwater control and management facilities shall be designed in accordance with Township Ordinance No. 473." *Id.* at 269a.

Moreover, Section 1208B provides that "[t]he term 'open space' shall be construed to mean 'common open space' as defined in Appendix 1." RR at 257a. In turn, Appendix I defines "common open space" as follows:

> A parcel or parcels of land or an area of water, or a combination of land and water within a land development or subdivision, designed and intended for the use and enjoyment of residents or occupants thereof, ***not including streets, off-street parking areas and areas set aside for public facilities.***

Zoning Ordinance Appendix I.B. at I–2 (emphasis added).

The gross tract area of the parcel is 4.22 acres. Accordingly, a minimum of 1.055 acres of open space is necessary under the minimum open space requirement of Section 1208B.2.a. of the Zoning Ordinance. However, as also indicated above, 0.18 acres of the 1.17–acre open space area consist of above ground stormwater management facilities, and 0.11 acres of the 1.17–acre open space area consist of below ground stormwater management features which may restrict the installation of above ground features. Thus, if the foregoing stormwater management facilities and features are deemed to be "public facilities", and thereby excluded from the area set aside for open space use under the definition of "common open space" in Appendix I.B. of the Zoning Ordinance, the minimum open space area requirement of Section 1208B.2.a. has not been met, and the Plan was properly rejected by the Board. *Robal Associates, Inc.*

█ Although the Zoning Ordinance does not define the term "public facilities", Appendix I.A. provides that "[t]erms not defined herein shall have the meaning customarily assigned to them." Appendix I.A. at I–1. In *In re Appeal of the Marietta Gravity Water Company,* 10 D. & C. 4th 50 (1990), *aff'd,* 145 Pa.Cmwlth. 183, 602 A.2d 903 (1992), a township board of supervisors granted approval for the expansion of an apartment complex in the PRD district served by on-site wells that were operated under a public water supply permit issued by the Pennsylvania Department of Environmental Resources (DER). The township's PRD ordinance required that "public facilities" be supplied to each building in such a development, and defined "public facilities" as a system that was available for service to the public and that was approved by DER. A private water company appealed the approval to the trial court arguing that the use of the on-site wells which only served the apartment complex did not qualify as "public facilities" under the PRD ordinance.

In considering the meaning of the term "public facilities" as used in the PRD ordinance the trial court stated the following, in pertinent part:

> [I]n considering the ordinary meaning of the word "public" when used as a noun, this court may look to dictionary definitions and common usage. Relevant dictionary definitions of the noun "public" are as follows:
>
> "(1) The general body of mankind, or of a nation, state or community; ... also, a particular body or aggregation of people,...." Webster's New Interna-

tional Dictionary, unabridged (2d ed.1942).

"(2) The people as a whole: populace. (3) A group of people having common interests or characteristics." Webster's New Collegiate Dictionary (1981).

Both dictionary definitions make clear that the word "public" means a particular group of people either in a community or with common interests or characteristics. The 1000 individuals who will live in the 500 homes comprising the planned residential development ... are, in this court's opinion, unquestionably a particular aggregation of people with common interests or characteristics and a sense of community, and are therefore "the public" within discrete geographic boundaries of the 88 acres constituting [the planned residential development].

\* &ast; &ast;

Based upon the foregoing discussion of the ordinary meaning of "the public", it cannot be said that the township's interpretation of the PRD ordinance is "clearly erroneous." To the contrary, the township's interpretation is the strongest and most relevant evidence that the Board of Supervisors intended to permit on-site water supply systems under the PRD ordinance. In fact, the rule requiring that great weight should be given to an administrative interpretation should be applied even more staunchly in the present case since the interpretation is not that of an administrative agency construing the action of a separate legislative body, but rather, is an interpretation of the enactment by the legislative body itself. In this court's opinion, the Board of Supervisors' interpretation of the PRD ordinance should clearly prevail over other artificial rules of construction or tangential indicia of intent.

*In re Appeal of the Marietta Gravity Water Company,* 10 D. & C. 4th at 56–57. Based on the foregoing, the trial court denied the private water company's appeal and affirmed the board's decision. *See id.* at 57–58.[8],[9]

8. On further appeal, this Court affirmed on the basis of the trial court's opinion. *See id.,* 602 A.2d at 903.

9. *See also A & L Investments v. Zoning Hearing Board of City of McKeesport,* 829 A.2d 775, 778–779 (Pa.Cmwlth.2003) ("Moreover, it has long been established under Pennsylvania law that a use may be public notwithstanding the fact that not every member of the public may participate in, or benefit from, the use. In the arena of legislative land development programs, our Supreme Court has expressly held that there is no constitutional requirement that the entire public benefit from a program before that program can be termed public. *Basehore v. Hampden Industrial Development Authority,* 433 Pa. 40, 248 A.2d 212 (1968). Further, the Supreme Court has expressly stated that '[i]t is not essential that the entire community or even any considerable portion of it should directly enjoy or participate in an improvement in order to make its use a public one.' *Id.* (citation omitted). Pennsylvania case law is rich with examples of uses held to be public in which not every member of the public may participate, or even benefit directly. *Accord: Shields v. City of Philadelphia,* 405 Pa. 600, 176 A.2d 697 (1962) (Little League baseball field is a public use notwithstanding the fact that not all city inhabitants would be able to use the field); *Jacobs v. Clearview Water Supply Co.,* 220 Pa. 388, 69 A. 870 (1908) (general public would benefit from eminent domain taking for private commercial and manufacturing purposes); *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 200 A. 834 (1938) (the fact that only part of the community could occupy proposed low income properties would not prevent such use from being a public use where indirect public benefit exists); *Borough of Big Run v. Shaw,* [16 Pa.Cmwlth. 623, 330 A.2d 315 (Pa. Cmwlth.1975)] (condemnation was not without public benefit even though proposed road would serve only limited number of properties).").

Likewise, the Board's determination that the stormwater management facilities and features located in the open space area of the Plan constitute "public facilities" under the Zoning Ordinance should prevail in this case. Section 1211.4.a. of the Zoning Ordinance provides that "[t]he storm drainage system for a PRD shall be designed and constructed so as to minimize erosion and flooding, using as necessary drainage easements, swales, catchment basins, [and] silt traps . . . so as to minimize runoff." RR at 268a. Thus, the stormwater management facilities and features in the Plan that are contained in and that serve the housing development must also be designed and constructed to prevent damage from increased runoff to the surrounding properties. Indeed, Applicant's engineer testified regarding how the stormwater management facilities and features were designed to prevent such increased flow and damage to the property in the development and in the neighboring areas of the Township. *See id.* at 48a–50a.[10]

The fact that the stormwater management facilities and features located in the open space area of the Plan are not designed to serve either the public at large or the Township at large does not preclude a determination that they are "public facilities" under the Zoning Ordinance. *In re Appeal of the Marietta Gravity Water Company.* The group of people to be served by the facilities and features, both

---

10. Specifically, Applicant's engineer testified, in pertinent part, as follows:

> Mr. McGlade: If I could make a quick comment or question. I think that's a great point with the drainage. No matter what the ultimate proposal looks like—Alex, I'm assuming that from an engineering perspective, we can figure out—or I shouldn't say we. From an engineering perspective, you can figure out how to keep drainage going back toward the farm, tank farm back there?
>
> Mr. Rodriguez: Yes. The drainage pipe you're talking about, it's a forty-eight inch pipe. The hundred year flow is able to get through that pipe. It doesn't mean there isn't an area that floods in order for it to get through. But it is containable within that culvert.
>
> We're at the head waters of the Marcus Hook Creek. Fortunately, it's not that large of a drainage area that gets there. But it's a small restriction at the forty-eight inch pipe. We have a basin, even though it's still below ground, we have it just high enough to collect the water runoff from our site and discharge it into the drainage canal so the water doesn't go off to other properties.
>
> Mr. King: That's what I have. There's a discharge pipe that comes out right behind [a neighboring property at] 18 Cella [Drive]. And when that thing is running full force, it fills up and floods. So there's no way another pipe can be directed to that waterway. There is no way. It can't handle it.
>
> Mr. Rodriguez: Like I said, that pipe, the forty-eight inch pipe has a known hundred year floodplain and get through the pipe. And our calculation, we have to show we're not going to increase that from our site with the runoff.
>
> If you look at the plan, there's a huge detention basin right here which is going to collect this runoff. We have swales along the property to make sure the water doesn't run off the property. We're pushing all of the water to the basin here. Then this basin will let it go to that same drainage channel.
>
> Mr. King: And there's no way that this pipe, which is right here that goes underground by my property, if you pipe out water from this basin to this water way back here into this pipe—
>
> Mr. Rodriguez: It's behind. It's back here. It's all the way back here that pipe.
>
> Mr. King: It's right here. This is my property right here. There's no way more water can go through that pipe the way it is now.
>
> Mr. Rodriguez: We're not trying to release more water. We will release it at the same predeveloped rate. We're not going to make that runoff worse. You can't make it much better, but we will keep it at the same preexisting conditions.

within and without the proposed planned residential development are "[u]nquestionably a particular aggregation of people with common interests or characteristics and a sense of community, and are therefore 'the public' within discrete geographic boundaries of the [neighboring areas of the Township and the planned residential development]." *Id.,* 10 D. & C. 4th at 56. Thus, the Board did not err in determining that the stormwater facilities and features constitute "public facilities" under the Zoning Ordinance. *Id.*

Because the stormwater management facilities and features located in the open space area of the Plan constitute "public facilities", their area is thereby excluded from the area set aside for open space use under the definition of "common open space" in Appendix I.B. of the Zoning Ordinance, and the minimum open space area requirement of Section 1208B.2.a. has not been met.[11] As a result, the Plan was properly rejected by the Board, and the trial court erred in granting Applicant's appeal and directing that the Plan may proceed as if approved subject to a number of conditions. *Robal Associates, Inc.*[12]

Accordingly, the trial court's order is reversed and the Board's decision is reinstated.

### ORDER

AND NOW, this 2nd day of December, 2011, the order of the Court of Common Pleas of Delaware County, Civil Division, dated May 26, 2010 at No. 08–13298, is REVERSED, and the decision of the Board of Commissioners of Upper Chi-

chester Township dated September 2, 2008, is REINSTATED.

---

**11.** *See also* Section 1212.1.b. of the Zoning Ordinance which provides that "[o]pen space areas shall contain no major structures other than those related to the purpose of the open space." RR at 270a.

**12.** Based on our disposition of this claim, we will not address the remaining allegations of error raised in this appeal.