Matthew Gouwens, Emily Gouwens, :
Hiller Hardie, Sharon Hardie, :
Kyle Rusche, and Meghan Rusche, :
    Appellants :
        :
        :
   v.      :
        :
Indiana Township Board of :
Supervisors and Fox Chapel : Nos. 544, 992-994 C.D. 2020
Estates, L.P. : Argued: May 10, 2021

BEFORE: HONORABLE PATRICIA A. McCULLOUGH, Judge
    HONORABLE CHRISTINE FIZZANO CANNON, Judge
    HONORABLE J. ANDREW CROMPTON, Judge

OPINION
BY JUDGE FIZZANO CANNON   FILED: July 8, 2021

   Matthew Gouwens, Emily Gouwens, Hiller Hardie, Sharon Hardie, Kyle Rusche and Meghan Rusche (Objectors), who are residents of Indiana Township (Township), appeal from the May 22, 2020, Order of the Court of Common Pleas of Allegheny County (trial court) affirming the decision of the Township Board of Supervisors (Board) to grant tentative approval of the application filed by Fox Chapel Estates, L.P. (Developer) for a Planned Residential Development. Upon review, we reverse.

## I. Factual & Procedural Background

   This matter returns after our previous decision, which remanded with directions that the Board issue a revised decision. *Gouwens v. Indiana Twp. Bd. of*

*Supervisors* (Pa. Cmwlth., No. 1377 C.D. 2018, filed June 25, 2019), 2019 WL 2587772 (*Gouwens I*) (unreported); Reproduced Record (R.R.) at 674a-91a. The relevant facts are set forth at length in our previous opinion and are summarized as follows.

In November 2016, Developer filed an application to develop a Planned Residential Development (PRD)[1] in the Township, to be known as Fox Chapel Estates (the PRD or the Plan). *Gouwens I*, slip op. at 2; R.R. at 675a. The PRD would consist of 91 townhouses built in 3 different designs. R.R. at 181a. The Board has concisely described these as follows:

> [R]oughly 50% of the homes will be the "Griffin" model which involves first floor living and will be marketed primarily to empty nesters. The "Schubert" design represents approximately 25% of the units and will be 2-3 bedroom traditional townhouses with the bedrooms located on the third level. The "Rosecliff" model represents approximately 25% of the proposed units and has a first floor living area and an upstairs master bedroom and will be marketed to active empty nesters.

Board Decision II, 9/10/19; R.R. at 696a.

The Plan set aside 60% of the total property acreage as common open space, which exceeded the 20% minimum required by the Township Zoning

---

[1] The Township of Indiana Zoning Ordinance #368, Allegheny County, Pa. (2011) (Zoning Ordinance), defines a PRD as:

> [a]n area of land, controlled by the landowner, to be developed as a single entity for a number of dwelling units, or combination of residential and non-residential uses, the development plan for which does not correspond in lot size, bulk, type of dwelling, or use, density, or intensity, lot coverage, and required open space to the regulations established in any one district, created from time to time, under the provisions of this Ordinance.

Zoning Ordinance § 201 (Definitions). A "dwelling unit" is "[o]ne (1) or more living or sleeping rooms with cooking and sanitary facilities for one family." *Id.*

Ordinance #368, Allegheny County, Pa. (2011) (Zoning Ordinance).[2]  R.R. at 187a & 206a; Zoning Ordinance § 409(G) (Common Open Space).  However, Developer's witness, Steven Victor (Victor), acknowledged in hearing testimony that significant portions of the open space were dedicated to stormwater management purposes.  *Id*. at 207a-08a.  In addition, although the Zoning Ordinance's definition of "common open space" requires that it be "designed and intended for the use or enjoyment" of residents, Victor conceded that much of the proposed common open space in the PRD is steeply sloped and, while visible from the townhouses, is unusable "passive open space."  *Id*. at 208a-09a; Zoning Ordinance § 201 (Definitions).  Objectors' expert witness, Andrew Schwartz (Schwartz), opined that if the unusable land within the designated common open space was deducted, the actual amount of land within the Zoning Ordinance's definition of "common open space" would be well below the Zoning Ordinance's 20% requirement.  *Id*. at 231a.

At a subsequent hearing, John Bench (Bench), a representative for Developer, responded that Developer had amended the Plan to include nature trails, gazebos, benches, and picnic areas throughout the property.  R.R. at 502a.  Objectors opposed the admission of any documentation in that regard.  *Id*. at 510a.  The Board recognized that the revised proposal was not part of the Plan submitted to be voted

---

[2] "Common Open Space" is defined as "[a] parcel or parcels of land or an area of water, or a combination of land and water within a development site and designed and intended for the use or enjoyment of residents of a development not including streets, off-street parking areas, and areas set aside for public facilities."  Zoning Ordinance § 201.

3

on and accepted Bench's revised proposal "as informational only."[3]  Board Decision II at 2; R.R. at 694a.

In addition, the Plan's proposed cul-de-sac was 2,370 feet in total length, or 1,700 feet from its intersection with the first road inside the PRD, which greatly exceeded the 800-foot limit set by the Township.  R.R. at 194a & 202a. Schwartz explained that an overly long cul-de-sac could create a safety hazard due to increased response time for fire and emergency vehicles if they miss an address and must drive extra distances to be able to turn around and return.[4]  *Id*. at 226a.

In January 2018, the Board tentatively approved the Plan in a 3-2 vote and issued its initial written decision.  Board Decision I, 1/17/18; R.R. at 621a-27a. Objectors appealed to the trial court, which took no new evidence but considered briefs and oral argument by the parties.  The trial court then issued its initial opinion and order on September 18, 2018, affirming the Board's tentative approval.  Trial Ct. Decision I, 9/18/18; R.R. at 669a-73a.  Objectors then appealed to this Court.

In *Gouwens I*, we concluded that the Board's initial January 2018 decision did not comply with Section 709(b) of the Pennsylvania Municipalities Planning Code (MPC),[5] which requires board decisions granting or denying approval of a PRD to explain how the plan responds or fails to respond to specific enumerated criteria in order to provide sufficient findings of fact to enable effective appellate review.  *Gouwens I*, slip op. at 6; R.R. at 680a (citing 53 P.S. § 10709(b)).  We

---

[3] Formal rules of evidence do not apply in local zoning proceedings, but "irrelevant, immaterial or unduly repetitious evidence may be excluded." *Town & Country Mgmt. Corp. v. Zoning Hearing Bd. of Borough of Emmaus*, 671 A.2d 790, 792 (Pa. Cmwlth. 1996).

[4] As discussed further below, although Developer suggested the local fire chief approved the length of the Plan's cul-de-sac, our review of the record reveals no evidence of such approval.

[5] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202.

4

pointed out that the Board's initial decision failed to explain how the Plan, with its three styles of townhouse designs, met the Zoning Ordinance's requirement of variety in the "type, design and arrangement of housing units." As such, "this Court cannot ascertain whether the Plan actually meets the requirement or whether the Board simply failed to adequately explain the basis for its decision[.]" *Gouwens I*, slip op. at 7-11; R.R. at 680a-84a. The Board also failed to explain the basis of its finding that the Plan met all of the enumerated and mandatory criteria for a PRD set forth in Section 401(F) of the Zoning Ordinance. *Gouwens I*, slip op. at 12-16; R.R. at 685a-89a. We therefore remanded to the trial court with instructions to remand the matter to the Board with directions to issue a new decision with appropriately rendered findings of fact and reasons for the grant of tentative approval of the Plan. *Gouwens I*, slip op. at 17; R.R. at 690a.

On remand, without taking additional evidence, the Board issued a revised decision in support of its grant of tentative approval of the Plan. Board Decision II; R.R. at 693a-704a.[6] Objectors appealed to the trial court, which also took no new evidence and again affirmed the Board. Trial Ct. Decision II; R.R. at 754a-59a. Objectors again appeal to this Court.

## II. Parties' Arguments

Objectors first argue that this Court's decision in *Gouwens I* is dispositive on the point that the Plan must include a variety in the "type, design and arrangement" of housing units, which they aver the Plan fails to do since it calls for

---

[6] The Board's decision expressly grants Developer modifications from various provisions of the Zoning Ordinance and the Township's Subdivision Ordinance (Ordinance No. 215, Allegheny County (2001)). Relevant to this appeal and as discussed below, the Board granted Developer a modification of Section 1268.03 of the Subdivision Ordinance, which limits cul-de-sac lengths to a maximum of 800 feet. Board Decision II; R.R. at 703a.

only townhouses, albeit three different designs. Objectors' Br. at 21-25. Objectors assert that because the Plan still fails to comply with Section 400 of the Zoning Ordinance, the Board's grant of tentative approval must be reversed. *Id*. at 24. Objectors also argue that the Board's revised decision still fails to support its determinations as to Section 401(F)'s required factors for PRD approval; therefore, reversal is warranted. *Id*. at 25-55.

Developer responds that this Court's discussion in *Gouwens I* concerning the housing variety aspect of the Plan did not constitute a substantive legal holding, but was *dictum* used as an example of defects in the Board's original decision that were to be cured on remand. Developer's Br. at 12-15. Developer further argues that the Board's revised decision includes sufficient factual findings, explanations, and reasoning to constitute substantial evidence of record in support of the Board's tentative approval of the Plan. *Id*. at 15-60.

In a separate brief, the Board offers a general defense of its revised decision, but focuses specifically on its assertion that the purpose of the Zoning Ordinance's variety requirement is to promote a variety of housing within the township as a whole rather than within any individual PRD. Board's Br. at 2-4.

### III. Analysis[7]

Article IV of the Township's Zoning Ordinance, which governs PRDs, is modeled on Article VII of the MPC. This Court has described PRDs as follows:

---

[7] Where, as here, the trial court took no additional evidence, we are limited to determining whether the governing body committed an error of law or abused its discretion. *Kang v. Supervisors of Twp. of Spring*, 776 A.2d 324, 327, n.7 (Pa. Cmwlth. 2001). Witness credibility is a determination to be made by the fact finder, here, the Board, and is generally not a proper subject for appellate review. *Bailey v. Zoning Bd. of Adjustment*, 780 A.2d 809, 813 (Pa. Cmwlth. 2001). Also, a zoning board's findings are owed deference in light of the board's "expertise in and

PRDs offer an alternative to traditional, cookie-cutter zoning. A PRD is a larger, integrated planned residential development which does not meet standards of the usual zoning districts and offers municipalities flexibility. It is this type of flexibility which the PRD provisions of the [MPC] ... are designed to offer the municipality. The idea behind PRD zoning is to create a method of approving large developments which overrides traditional zoning controls and permits the introduction of flexibility into the design of larger developments.

*Kang v. Supervisors of Twp. of Spring*, 776 A.2d 324, 328 (Pa. Cmwlth. 2001) (citations & quotation marks omitted). Section 702 of the MPC grants each municipality the authority to enact individualized PRD ordinances in order to "[s]et forth the standards, conditions and regulations for a planned residential development consistent with the provisions of this article." 53 P.S. § 10702.

Given the unique nature of a PRD and its character as a departure from traditional zoning requirements, a zoning board must ensure, prior to granting tentative approval, that the planned PRD does, in fact, meet the specific requirements in the locality's zoning ordinance. *Gouwens I*, slip op. at 9-10; R.R. at 682a-83a (citing 53 P.S. § 10702). This is because a PRD "overrides traditional zoning controls" and, upon tentative approval, effectively amends the zoning map. *Gouwens I*, slip op. at 10; R.R. at 683a (quoting *Kang* & Section 710 of the MPC, 53 P.S. § 10710(a)).

---

knowledge of local conditions." *Marshall v. Phila. Zoning Bd. of Adjustment*, 97 A.3d 323, 333 (Pa. 2014). However, the governing body abuses its discretion when its findings of fact are not supported by substantial evidence. *Kang*, 776 A.2d at 327 n.7.

**A. Section 400: Variety in "Type, Design and Arrangement of Housing Units"**

Section 400 of the Zoning Ordinance sets forth the purposes that PRDs in the Township must satisfy:

> In order to encourage innovations in residential development, to better meet modern housing demands, *to create variety in the type, design and arrangement of housing units*, to conserve and permit economies in providing public services and to reflect changes in the technology in land development and to relate the development of land to the specific site, *a [PRD] may be approved under the provisions of this Ordinance if, and only if, they* [sic] *accomplish the foregoing purposes* and they [sic] comply with all other ordinances and regulations of the Township or the County or State not inconsistent herewith[.]

Zoning Ordinance § 400 (emphasis added).

In *Gouwens I*, this Court closely examined Section 400's "variety requirement." *Gouwens I*, slip op. at 7-11; R.R. at 680a-84a. We relied on Section 400's plain language, mandatory quality, and the dictionary definition of "variety" to conclude that Section 400 allows for PRD approval "*'if and only if'* there is 'a variety in the type, design and arrangement of housing units,' that is, (1) more than one type of housing unit, (2) more than one design of housing unit and (3) more than one arrangement of housing unit." *Gouwens I*, slip op. at 10-11; R.R. at 683a-84a (emphasis added). We therefore rejected the Board's original explanation that the Plan's inclusion of three models of townhouses provided enough variety to satisfy Section 400's variety requirement: "At best, the Developer's intention to build three models of townhouses may support a conclusion that the Plan has more than one 'design' of housing unit." *Gouwens I*, slip op. at 11; R.R. at 684a.

8

On remand, the Board again concludes that the Plan's inclusion of three models of townhouses meets the variety in "type" requirement. Board Decision II; R.R. at 696a. The Board also offers a new basis for finding the Plan meets this requirement:

> The *design and arrangement* proposed by [Developer] is different than [sic] the other homes *designed and arranged* throughout Indiana Township. [Michelle Mattioli, a] real estate agent[,] credibly testified that this *type of development* is lacking and is needed in the Township.[8] Steven Victor credibly testified that the townhomes allow for a variety of users and that there is a market for these types of housing.
>
> The [Board] interprets the PRD Ordinance's purpose to require a variety in *design and arrangement* as to the entire Township.

Board Decision II; R.R. at 696a (emphasis added).

Objectors argue that the Board's new explanation still fails to satisfy Section 400's variety requirement because the Plan itself must contain a variety of housing types, designs, and arrangements. Objectors' Br. at 21-25 & 31-32. Developer counters that the Board's newly expressed interpretation of the Zoning Ordinance's variety requirement as applying in scope to the Township as a whole rather than to this specific PRD Plan warrants deference.[9] Developer's Br. at 12-15 & 23-24.

---

[8] The Board stated in its decision that Linda Massarelli was the real estate agent who testified at the hearing. Ms. Massarelli did testify as a local resident stating her concerns with the PRD, but our review of the record reflects that Michelle Mattioli was, in fact, the real estate agent who testified.

[9] Both sides address the applicability of *Ligo v. Slippery Rock Township*, 936 A.2d 1236 (Pa. Cmwlth. 2007), where this Court found the township's ordinance did not require multiple

9

Our remand gave the Board the opportunity to explain how the Plan, with its three different designs of townhouses, met the variety requirement as written in Section 400 of the Zoning Ordinance. We agree with Objectors that the Board's new explanation is a legally insufficient interpretation of Section 400 and is also unsupported by substantial evidence of record. First, as written, Section 400 states that "a [PRD] may be approved under the provisions of this Ordinance *if and only if* they [sic] accomplish [Section 400's] purposes[,]" including "variety in the type, design and arrangement of housing units[.]" Zoning Ordinance § 400 (emphasis added). The use of "they" in Section 400 may be somewhat inartful, but in the context of the entire provision, it can only be understood as referring to a specific proposed PRD plan, as this Court determined in *Gouwens I*, slip op. at 10-11; R.R. at 683a-84a.

To read this language in Section 400 as extending its scope to the Township as a whole, as the Board and Developer now suggest, is not reasonable or consistent with the plain language of the Zoning Ordinance itself. As this Court previously concluded, the Plan *itself* must satisfy the requirement of Section 400 as written, by including within the PRD a true variety of housing types, designs, and arrangements, not just different models or styles of a single type, such as townhouses. *See Gouwens I*, slip op. at 10-11; R.R. at 683a-84a ("Section 400 provides as a requirement that the Plan have a "*variety* in the type, design and arrangements of housing units[.]") (emphasis in original).

Generally, deference to a local zoning board's interpretation of its ordinances is warranted unless shown to be clearly erroneous. *Kohl v. Sewickley*

---

types of housing within a single PRD. *Id*. at 1245. Notably, however, the language of the ordinance at issue in *Ligo* did not have the mandatory quality of the "*if and only if*" language present in Section 400 of the Township's Zoning Ordinance. Therefore, *Ligo* is not germane here.

*Twp. Zoning Hearing Bd.*, 108 A.3d 961, 968-69 (Pa. Cmwlth. 2015); *see also Fleishon v. Phila. Zoning Bd. of Adjustment*, 122 A.2d 673, 677 (Pa. 1956) (rejecting board's interpretation of zoning ordinance); *S. Coventry Twp. Bd. of Supervisors v. Zoning Hearing Bd. of S. Coventry Twp.*, 732 A.2d 12, 16-17 (Pa. Cmwlth. 1999) (same). Also, the interpretation of an ordinance is a question of law over which this Court's review is plenary and which begins with examination of the text itself. *Kohl*, 108 A.3d at 968.[10]

Here, even according such deference, the Board's interpretation simply cannot be reconciled with the plain language of Section 400, which as this Court has previously found, requires a PRD in the Township to include a variety of housing types, a variety in housing designs, and a variety of housing arrangements. *Gouwens I*, slip op. at 10-11; R.R. at 683a-84a. The Board's revised decision now attempts to avoid the plain language of Section 400 by downplaying the Plan's lack of variety of types of housing units and highlighting its "design and arrangement" of houses as unique to the Township as a whole. Board Decision II; R.R. at 696a. The Board's interpretation, which fails to comply with the plain requirements of the Zoning Ordinance, constitutes legal error.

Moreover, the Board's conclusions that the "type of development" the Plan provides (townhouses only, rather than a variety in type of housing units within the Plan) is "lacking" in the Township, that the PRD would appeal to a variety of

---

[10] Beyond zoning matters, courts are empowered to reject a local or governmental entity's interpretation of an ordinance, plan, or regulation of its own making if that interpretation defies the plain language of the text at issue. *See United Police Soc'y of Mt. Lebanon v. Mt. Lebanon Comm'n*, 104 A.3d 1251, 1263 (Pa. 2014) (rejecting municipality's interpretation of its police pension plan as contrary to language of the plan); *Pa. Dep't of Health v. McKelvey* (Pa. Cmwlth., No. 1372 C.D. 2017, filed Sept. 27, 2018), slip op. at 9, 2018 WL 4623388, at *4 (unreported) ("because the Department's interpretation is inconsistent with the plain language of the regulation, we reject the Department's argument that its interpretation of its regulation is entitled to deference").

users, and that there is a market for townhouses, are not supported by the record. *See* Board Decision II; R.R. at 696a.

Victor, speaking for Developer at hearings on the Plan, acknowledged that the PRD consisted only of townhouses in three different designs. R.R. at 13a & 181a. At the time of this Court's consideration of the Plan in *Gouwens I*, the Board's decision did not contain any indication that Developer had satisfied Section 400 by including other types of housing in the PRD. The revised Board decision still contains no such indication. The Board relies on the hearing testimony of Ms. Mattioli, a local real estate agent, for its conclusion that "this type of development is lacking and is needed in the Township." Board Decision II; R.R. at 696a. However, Ms. Mattioli stated only that her clients seek new construction residences generally; her testimony did not specify that townhouses are lacking or in any particular demand in the Township. R.R. at 277a-78a. The record, therefore, lacks support for a conclusion that the Plan provides either a variety in the type of housing units within the PRD or a variety of development types within the Township. This is so even if variety in development type within the Township, and not housing units within a given PRD, were all that Section 400 required. *See Gouwens I*, slip op. at 10-11; R.R. at 683a-84a.

Because the Board's interpretation of Section 400's variety requirement is contrary to the plain language of that provision and there is no evidence of record to support the Board's conclusion that Developer's Plan satisfies that requirement, the Board's grant of tentative approval of the PRD constituted both legal error and an abuse of discretion.

12

**B. Section 401(F) Criteria for Tentative Approval**

In addition to satisfying the "purposes" requirements of Section 400, a proposed PRD must meet criteria enumerated in Section 401(F). Relevant to this appeal, Section 400 requires:

> 3. The proposal and methods for the maintenance and conversion of any proposed common open space are reliable, and the amount and extent of improvements of the remaining land are appropriate with respect to the purpose, use, and type of residential development proposed.

> 4. The physical design of the proposed development plan adequately provides for internal traffic circulation, and parking, light, air, recreation, and conservation of natural amenities, green ways, and open spaces.

Zoning Ordinance § 401(F)(3) & (4). In *Gouwens I*, we did not address these two criteria, having concluded that the Board's original decision as a whole failed to adequately support its conclusion that all of the requisite criteria had been met. *Gouwens I*, slip op. at 12-16; R.R. at 685a-89a. We discuss them here for completeness.

**1. Section 401(F)(3): Common Open Space**

Section 401(F)(3) requires a PRD proposal to assure that "[t]he proposal and methods for the maintenance and conversion of any proposed common open space are reliable[.]" Zoning Ordinance § 401(F)(3). Section 409(G) states that "[n]o less than 20% of the [PRD] shall be set aside for Common Open Space." Zoning Ordinance § 409(G) (Development Standards). "Common Public Space" is defined as "[a] parcel or parcels of land or an area of water, or a combination of land

13

and water within a development site and designed and intended for the use or enjoyment of residents of a development not including streets, off-street parking areas, and areas set aside for public facilities." Zoning Ordinance § 201 (Definitions); *see also* Section 107 of the MPC, 53 P.S. § 10107 (identical definition in the MPC).

We have described "common open space," as defined in the MPC and Zoning Ordinance, as a means to ensure that PRDs contain mechanisms "to provide a greater opportunity for recreation and to provide for the conservation and more efficient use of open space ancillary to dwellings." *Michaels Dev. Co. v. Benzinger Twp. Bd. of Supervisors*, 413 A.2d 743, 747 (Pa. Cmwlth. 1980). Minimum open space requirements are both objective and substantive, and a PRD plan may be rejected if these requirements are not met. *Robal Assocs., Inc. v. Bd. of Supervisors of Charlestown Twp.*, 999 A.2d 630, 637 (Pa. Cmwlth. 2010).

Here, Objectors argue that the Plan fails to ensure that at least 20% of the total land on the site will truly be common open space "designed and intended for the use or enjoyment of residents" as defined and required by Section 401(F)(3) of the Zoning Ordinance. Objectors' Br. at 38-42. Developer responds that the presence of the term "common open space" in Section 401(F)(3) does not require that a PRD provide "usable" common open space or that the space satisfy the Zoning Ordinance's definition of the term. Developer's Br. at 34-36. Developer adds that even if Objectors' reading of Section 401(F)(3) is correct, the Plan as tentatively approved by the Board satisfied the Zoning Ordinance by reserving open space "akin to the undeveloped area of a public park" that would be "both usable and enjoyable" for PRD residents. Developer's Br. at 35-37.

14

The Board's previous decision stated only that the Plan set aside "in excess of 20% of the PRD for common open space" and that the creation of a homeowners' association to own, operate, and maintain the open space satisfied the Zoning Ordinance's requirements. R.R. at 622a-23a. The Board's revised decision states:

> The formation of a homeowner's association is a reliable method for maintaining the common open space of the project which satisfies Section 401(F)(3) of the Zoning Code. The Applicant has set aside 60 [percent] of the Property for open space and will deed the open space over to a homeowner's association for maintenance and preservation. This amount of space to be deeded is appropriate in that it meets the specific criteria regarding open space as set forth in 409 (G) and 409(H) of the Zoning [Ordinance]. The Board finds that this is adequate protection to the public that the open space will be maintained properly. The [Board] finds that the criteria in Section 401(F)(3) have been satisfied.

Board Decision II; R.R. at 697a. The trial court agreed, finding generally that the Board's conclusions were supported by substantial and credible evidence. Trial Ct. Decision II; R.R. at 757a.

However, we agree with Objectors that the general definition of "common open space" in Section 201 of the Zoning Ordinance applies to the specific provisions of Article IV of the Zoning Ordinance, which governs PRDs. Sections 401(F)(3) and 409(G) specifically use the phrase "common open space" in requiring that a PRD Plan include reliable proposals for such space and that no less than 20% of the PRD's total acreage be set aside for such space. Where a legislative body defines the words or terms it uses in a statute, those definitions are binding. *McCloskey v. Pa. Pub. Util. Comm'n*, 219 A.3d 692, 701 (Pa. Cmwlth. 2019).

15

As such, the definition's requirement that common open space be "designed and intended for the use or enjoyment of residents of a development not including streets, off-street parking areas, and areas set aside for public facilities" applies to PRDs. Zoning Ordinance § 201. The mere fact that such spaces will be deeded to a PRD homeowners' association for operation and maintenance as set forth in Section 409(H) will not satisfy Section 401(F)(3)'s requirement that a PRD plan include a reliable proposal and methods for devising and maintaining common open space commensurate with the Zoning Ordinance's definition of that term.

Here, the Plan set aside 60% of the total property acreage (roughly 14 of the total 23 acres) as open space. R.R. at 187a & 206a. However, significant portions of that land were dedicated to stormwater management purposes. *Id*. at 207a-08a. When questioned by counsel for Objectors about the Zoning Ordinance's definitional requirement that common open space be "designed and intended for the use or enjoyment" of residents, Victor stated that the PRD is to be marketed primarily to older "empty nesters." *Id*. at 209a. Victor suggested that these residents would most likely limit their actual use of the grounds to walking around the PRD's paved streets, but added that "being able to be in your townhouse unit and look out the back into that open space . . . is part of the use and enjoyment of that space." *Id*.

In *Harvin v. Board of Commissioners of Upper Chichester Township*, 33 A.3d 709 (Pa. Cmwlth. 2011), we considered whether a proposed PRD that attempted to include stormwater management areas in its common open space satisfied a township's requirements where the township's definition of "common open space," like the Zoning Ordinance here, excluded "public facilities" from the calculation of common open space. *Id*. at 714. We concluded that the proposal's stormwater treatment facilities were indeed public facilities; therefore, that land

16

could not be included in the common open space calculation, which consequently fell below the minimum required percentage of total acreage, and the trial court's grant of approval was in error. *Id*. at 716-17.

Here, the Zoning Ordinance's definition of common open space also specifically excludes "public facilities." Zoning Ordinance § 201. This case is therefore analogous to *Harvin*. 33 A.3d at 711 & n.3. As such, those portions of the Plan cannot be included in the common open space calculation. Victor's testimony before the Board did not include a specific acreage percentage of the proposed open space that was taken up by stormwater management facilities and features, and our review of the record did not find a straightforward statement of such a percentage. However, Victor did acknowledge that four such features were included in the Plan. R.R. at 207a. These would have to be deducted from the 60% (or roughly 14 acres) that Developer currently asserts to be common open space. As such, the Board's conclusion that the Plan meets the percentage requirements of the Zoning Ordinance is unsupported by the record.

Moreover, even without deducting the acreage dedicated to stormwater management, the Plan fails to establish that the space as currently envisioned satisfies the definitional requirement that it be "designed and intended for the use or enjoyment" of the PRD's residents. There is no indication in Victor's testimony that the spaces he referred to were "designed" at all, much less designed for the use or enjoyment of the PRD's residents. Instead, Victor's testimony suggested that no design was needed because the residents, whom he described as older "empty nesters," were likely to walk solely on the PRD's paved streets and would only be looking at the open space out of their townhouse windows. R.R. at 209a.

17

In *Michaels*, this Court found that a PRD plan complied with the township's common open space requirements even though at least some of the space was located on steep terrain covered with vegetation and far removed from most of the dwelling units. *Id*. at 747. There, the plan's open space met the local ordinance's 25% minimum and the objectors (and the board that rejected the PRD) had not sufficiently explained why its location was unacceptable or why "leaving the wooded area untouched is not the most efficient use of that open space." *Id*.

Although in *Michaels* this Court allowed a PRD plan where the open space was, like here, sloped terrain left essentially untouched, there, by contrast, the developer had also "designated certain areas of open space for recreational activities and [had] planned for children's play areas scattered throughout the units, for a basketball court and for a community building." 413 A.2d at 747. Here, the record is devoid of a clear evaluation of how the Plan meets Developer's assertion that 60% (or even 20% as the Zoning Ordinance requires) of the total acreage will be common open space within the Zoning Ordinance's binding definition of that term, which requires such space to be designed for the use or enjoyment of residents. Yet the Board essentially adopted Developer's assertions wholesale. Board Decision II; R.R. at 697a.

In short, the percentage of the Plan's acreage devoted to stormwater management, which also is not clearly indicated, cannot be included (pursuant to *Harvin*), and the record lacks evidence that whatever open space is left is "designed and intended for the use or enjoyment" of the PRD's residents as the Zoning Ordinance's definition requires. Moreover, although Developer's representative, Bench, failed in his subsequent attempt to submit a revised Plan with newly included nature trails, gazebos, benches, and picnic areas, his testimony essentially admitted

18

that Developer realized the Plan as originally submitted did not meet the Zoning Ordinance's common open space requirements. *See* R.R. at 502a & 694a.

Because the record does not support Developer's averment that the Plan includes sufficient "common open space" to conform to the Zoning Ordinance's definition of that term, the Board's conclusion that the Plan met Section 401(F)(3) constituted legal error and an abuse of discretion.

## 2. Section 401(F)(4): Internal Traffic Circulation

Section 401(F)(4) requires a PRD proposal to assure that "[t]he physical design of the [PRD] adequately provides for internal traffic circulation, and parking, light, air, recreation, and conservation of natural amenities, green ways, and open spaces." Zoning Ordinance § 401(F)(4). Section 409(N) (Roads and Parking) states that "[t]he dimensions and construction of . . . streets . . . within the PRD will comply with the standards of the Township at the time the application is approved." Zoning Ordinance § 409(N). Also, "the [Board] may allow for lesser standards which shall not be contrary to the community goals and objectives (Article I, Section 104) and the Township Comprehensive Plan." *Id*.

The Township has enacted an ordinance (which is applicable to PRDs pursuant to Section 409(N) of the Zoning Ordinance) stating that "[c]ul-de-sacs . . . shall not be longer than [800] feet including turn-around[.]" Indiana Township Ordinance No. 215, Allegheny County (2001) § 1268.03 (Cul-de-Sac Ordinance). However, the Board "may approve a cul-de-sac longer than [800] feet if it is determined by the [Board] that such additional length improves the subdivision design, results in a better relationship of the proposed development to the natural landscape and does not create any hardships for the subdivision resident or the

19

Township." *Id*. Here, the Board granted a modification of the Cul-de-Sac Ordinance in order to permit the Plan's cul-de-sac, which exceeds the 800-foot limit. Board Decision II; R.R. at 703a.

Objectors assert that the Board erred in finding that the Plan satisfied Section 401(F)(4) concerning the treatment of internal traffic circulation and aver that the Board should not have granted Developer a modification from the Cul-de-Sac Ordinance for the Plan's lengthy cul-de-sac, which creates a safety hazard because it will force fire trucks and emergency vehicles to travel excessive distances and lose response time in the event of a wrong turn or address. Objectors' Br. at 43. Developer responds that the cul-de-sac was approved by the Township's fire chief. Developer's Br. at 36-40 & 54.

The Plan's proposed cul-de-sac of 2,370 feet in length, or 1,700 feet in length if measured from its intersection with the first road within the PRD, exceeded the Cul-de-Sac Ordinance's 800-foot limit. Indeed, Victor initially acknowledged at the hearings that the cul-de-sac was "extremely long," a "worst-case scenario," and even unreasonable. R.R. at 204a. Now, in support of its argument that the nonconforming length of the cul-de-sac was reasonable, Developer points to Victor's later explanation that after Developer concluded it would be unlikely to obtain Department of Transportation approval for multiple access points into and from the PRD, the property location had only one access point and the lengthy cul-de-sac was necessary. R.R. at 194a & 202a-05a.

For Objectors, Schwartz explained the potential danger of an overly long cul-de-sac:

> [F]ire companies will be concerned about the length of the
> cul-de-sac because it does affect the response time. So as
> the road gets longer, if there's a wrong address, if there's

20

> a wrong turn, [a fire truck has] to get to that nearest intersection or [has] to get to the next cul-de-sac to be able to get back out, so from a life safety standpoint, cul-de-sac length starts to make impacts in terms of the neighborhood and [in] terms of community.

R.R. at 225a. Counsel for the Township responded by asking Schwartz whether he was aware that "the fire chief reviewed this cul-de-sac length for safety, and approved it"; Schwartz answered that he was not. R.R. at 242a. On remand, the Board found for the first time that Schwartz's testimony was not credible and suggested that Schwartz was "evasive" about his and his firm's credentials as zoning officers for other localities. Board Decision II; R.R. at 695a. The Board also described Schwartz's testimony concerning the length of the cul-de-sac as 2,370 feet, its total length, as opposed to 1,700 feet from its intersection with the first road inside the PRD, as "wildly inaccurate." Board Decision II; R.R. at 695a. The Board therefore concluded that Schwartz "did not review the proposed plan very carefully" and rejected his testimony "on any issue regarding the Plan itself." Board Decision II; R.R. at 695a.

It is true that witness credibility is a determination to be made by the fact finder – here, the Board – and generally is not a proper subject for appellate review. *Bailey v. Zoning Bd. of Adjustment*, 780 A.2d 809, 813 (Pa. Cmwlth. 2001). However, an appellate court may overturn a credibility determination "if it is arbitrary and capricious or so fundamentally dependent on a misapprehension of material facts, or so otherwise flawed, as to render it irrational." *Whitacker-Reid v. Pottsgrove Sch. Dist., Bd. of Sch. Dirs.*, 160 A.3d 905, 916 (Pa. Cmwlth 2017) (quoting *Bonatesta v. N. Cambria Sch. Dist.*, 48 A.3d 552, 558 (Pa. Cmwlth. 2012)). "A capricious disregard of evidence exists only when there is a willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary

21

intelligence could not possibly have avoided in reaching a result." *Bonatesta*, 48 A.3d at 558.

First, the Board's rejection of Schwartz's testimony concerning his and his firm's credentials and characterization of his statements in this regard as "evasive" is not supported by substantial evidence, or indeed any evidence, in the record. For the Board's benefit at the hearings, Objectors' counsel asked Schwartz to recite his qualifications. R.R. at 211a-16a. Schwartz stated that he personally has drafted about 100 zoning ordinances over the course of his 28-year career in planning and design. *Id*. at 213a. Schwartz added: "*Our office functions as zoning officers in six communities, so we do plan reviews*, just as you guys (the Board) have gone through, and in some communities, [we] focus specifically on PRDs because they're more complicated views." *Id*. at 214a (emphasis added). When questioned by the Board's counsel whether he himself had been a "zoning officer," Schwartz explained: "*Depends on the purpose of the firm in the community*. In places like Middlesex [Township], me personally. . . . [I]n some other communities, other staff members that I would oversee." *Id*. at 215a (emphasis added). He then clarified that in these instances "we have functioned as kind of authors of zoning ordinances, in terms of preparation" and "as kind of the supplemental staff, so to speak" to the local zoning board. *Id*. at 216a. When questioned by Developer's counsel on the same issue, Schwartz clarified that he personally is not a "designated zoning officer," but explained: "I said we function as a—as a supplement to a zoning officer. We often do PRD reviews because they're time consuming, so we help the staff do those types of reviews." *Id*. at 240a.

The Board's characterization of Schwartz's testimony in this regard as "evasive" implies that Schwartz misstated himself as being a "zoning officer" in the

22

sense of an official appointed by a locality to administer and adjudicate its zoning ordinance. However, the Board ignores Schwartz's initial statement, which he made even before adverse questioning, that his role personally (and that of his firm) with regard to local zoning authorities was to be directly involved with those communities, but in a capacity limited to conducting "plan reviews" for their needs. R.R. at 214a & 216a. When questioned, Schwartz clarified that his and his firm's roles in this regard depended "on the purpose of the firm in the community," which could be either as zoning ordinance authors or in conducting PRD reviews on behalf of the community. *Id.* at 240a. At no time did Schwartz assert that he personally or his firm had actually been "designated zoning officers" in any official capacity for the communities within which they worked. *Id.*

Schwartz's lengthy curriculum vitae (CV), which is of record, and copies of which were provided to the Board, also supports his assertion that he has worked for and represented numerous localities throughout Pennsylvania, both in preparing zoning ordinances and representing those localities in zoning matters. *Id.* at 216a & 450a-57a. Consistently with Schwartz's testimony, his CV lists the localities where he has served in that capacity; it does not state or imply that he has served those communities as an official or appointed zoning officer. We have closely reviewed Schwartz's explanation of his personal experience and his firm's experience under his supervision in the limited area he described of helping localities develop zoning ordinances and review development plan submissions. Based on that review, we find no basis for the Board's description of it as evasive. To the contrary, when questioned about his experience by a Board member during his testimony, Schwartz provided detailed and consistent responses and pointed to the portions of his CV that related to each response. *Id.* at 215a-16a.

23

Also, the Board's rejection of Schwartz's testimony concerning the excessive length of the PRD's proposed cul-de-sac is untenable. *See* Board Decision II; R.R. at 695a. Schwartz's testimony concerning the length of the cul-de-sac was confirmed by Victor's previous testimony, which the Board did not expressly credit but generally adopted throughout its decision. *Compare* R.R. at 194a & 202a (Victor's testimony acknowledging the 1,700- and 2,370-foot measurements), *with* R.R. at 224a & 241a (Schwartz's testimony). The Board's description of that particular testimony by Schwartz as "wildly inaccurate" is therefore contradicted by the record.[11] As such, in terms of Schwartz's credentials and his opinion on the length of the cul-de-sac, we therefore find the Board's rejection of his credibility was improperly based on a willful and capricious disregard of competent and relevant testimonial evidence.[12]

Moreover, even if the Plan's cul-de-sac is measured at 1,700 feet, its length from its intersection with the first road inside the PRD to its end, it is still more than twice the maximum length of 800 feet permitted by the Cul-de-Sac Ordinance. The Board's grant of a modification of that limit was, by any accounting, a significant departure from the standards set by the Township. Board Decision II;

_____

[11] Victor, however, incorrectly stated in his testimony that the Township allowed cul-de-sacs up to 1,200 feet in length, thus implying that the Plan's deviation from the allowable maximum was substantially less than it actually was. *See* R.R. at 194a & 202a.

[12] Moreover, with regard to the common open space issue discussed above, the attempt by Bench, Developer's representative, to submit a revised Plan with improved accommodations and concessions for the PRD's common open space, after Schwartz's testimony in that regard a month earlier, suggests at the very least that Developer acknowledged the reliability of Schwartz's detailed testimony critiquing that aspect of the Plan. R.R. at 502a. Bench described Developer's efforts as responsive to the concerns of the neighbors who testified rather than to Schwartz's testimony about the lack of true common open space. *Id.* However, the neighbors did not express opinions on the Plan's provision of common open space within the PRD. *Id.* at 252a-82a. Instead, the neighbors focused on the PRD's potential impact on nearby schools, property values, traffic, the environment, and the process by which the PRD had been presented to the Township's residents. *Id.*

24

R.R. at 703a. Because a PRD, upon tentative approval, effectively amends the zoning map, such departures are important matters. *Gouwens I*, slip op. at 10; R.R. at 683a.

As noted, Schwartz testified that the length of the cul-de-sac raises concerns that fire and emergency vehicles will have to travel longer to turn around and come back if they are in the PRD and miss an address the first time. R.R. at 226a. This creates safety hazards, which are obviously a concern for any community. Notably, Victor did not speak to this issue when he testified. The only time Developer addressed the issue at all during the hearings was when its counsel responded to Schwartz's concerns by suggesting, in his questioning, that the local fire chief had reviewed this cul-de-sac length for safety and approved it. *Id*. at 242a.

The Board did not address Schwartz's emergency safety concerns with the Plan's cul-de-sac, having discredited his testimony as a whole, but simply concluded that the Plan "adequately provides for internal traffic circulation." Board Decision II; R.R. at 697a. This determination was not supported by the record. Victor's testimony did not address safety concerns at all, and after careful review of the full record, we find no evidence that Developer ever addressed this issue throughout the application process.

Indeed, the record contains no evidence that the Township's fire authorities ever approved the cul-de-sac length for safety. Notably, a November 2016 letter from the Allegheny County Executive to Developer raised concerns about "the safe and efficient movement of other vehicles such as . . . fire trucks." Original Record (O.R.) Vol. 1 at 132. In its response, Developer addressed another concern about the Plan's lack of sidewalks, but did not address the County's emergency vehicle safety concern. *Id*. at 1616. The Township Planning

Commission meeting minutes from March 28, 2018, reflect commentary by the Township's engineer that the fire department must provide a letter "regarding the adequacy of fire protection and hydrant location," but do not mention approval of the length of the cul-de-sac. O.R. Vol. 1 at 799 & 802. The only evidence of any approval of the Plan by the Township's Fire Marshal is a June 26, 2018, letter limited to the Plan's provisions for fire hydrants. *Id*. at 853. The Marshal wrote that he had reviewed the PRD's fire hydrant plan and, with the addition of one more hydrant, approval could be expected. *Id*. at 853. The letter does not address the issue of fire truck safety as related to the excessive length of the cul-de-sac

Based on this record, the safety concerns initially raised over the cul-de-sac by the County and the Township's engineer, then by Schwartz, were never addressed by Developer. By the same token, the implication by Township counsel when questioning Schwartz at the hearing that the fire chief "reviewed this cul-de-sac for safety, and approved it," is unsupported. *See* R.R. at 242a. Therefore, the Board's determination to grant the Plan a modification of the Cul-de-Sac Ordinance's 800-foot limit, as well as its related determination that the Plan met the Zoning Ordinance's requirement in Section 401(F)(3) of adequate provisions for internal traffic circulation, were both legally insufficient and an abuse of discretion.

## IV. Conclusion

Based on the foregoing analysis, the Board's determinations that the Plan met the Zoning Ordinance's requirements for "variety in the type, design and arrangement of housing units," common open space, and adequate provision of internal traffic circulation are not adequately provided for in the Board's decision and are unsupported by substantial evidence of record. Because the Plan did not

26

comply with the requirements of the Zoning Ordinance, the Board's grant of tentative approval was in error and the trial court's affirmance of that determination is reversed.

_____
CHRISTINE FIZZANO CANNON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Matthew Gouwens, Emily Gouwens, | : | |
| Hiller Hardie, Sharon Hardie, | : | |
| Kyle Rusche, and Meghan Rusche, | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| Indiana Township Board of | : | |
| Supervisors and Fox Chapel | : | Nos. 544, 992-994 C.D. 2020 |
| Estates, L.P. | : | |

## O R D E R

AND NOW, this 8th day of July, 2021, the Order of the Court of Common Pleas of Allegheny County is REVERSED.

_____
CHRISTINE FIZZANO CANNON, Judge