IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Daniel Blackman, Kristi J. Blackman, :
Donald L. Weaver, Garrett L. Weaver, :
Chad T. Struble, Josh N. Rumpff, and :
Rachael L. Rumpff :
  :
             v. : No. 1674 C.D. 2024
  : Submitted: March 3, 2026
Athens Township, Bishop Brothers :
Construction Co., Inc., and Jeanette H. :
Minard :
  :
Appeal of: Donald L. Weaver, Garrett :
L. Weaver, Josh N. Rumpff, Rachael L. :
Rumpff, and Chad T. Struble :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE STACY WALLACE, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WALLACE                      FILED: April 9, 2026

In this case, Donald L. Weaver, Garrett L. Weaver, Josh N. Rumpff, Rachael L. Rumpff, and Chad T. Struble (Landowners) appeal from the order of the Bradford County Court of Common Pleas (trial court), dated November 7, 2024, which denied Landowners' appeal from the decision of the Athens Township Board of Supervisors (Board), granting conditional use approval to Bishop Brothers Construction Co., Inc. (Bishop Brothers) for the operation of a mine. After careful review, we affirm.

## BACKGROUND

Bishop Brothers filed an application with the Board, seeking a conditional use to operate a rock, gravel, and sand mine in the Athens Township Agricultural Zoning District. A hearing occurred before the Board on February 9, 2021. Relevant to this appeal, the Board heard testimony from Tim Gourley (Gourley), the project engineer for the mine, who explained the property where the mine would be located (Property) is over 500 acres in size, and the mining area would include approximately 375 acres. Reproduced Record (R.R.) at 54a. Gourley testified Bishop Brothers would employ "blasting to extract the rock" from the mine. *Id.* at 59a. He testified any blasts would be "very short" in duration and occur approximately "once a month . . . if everything goes well." *Id.* at 59a, 63a. The Board also heard testimony from Dustin Bishop, the Vice President of Bishop Brothers, who maintained blasting at the mine would occur less often than Gourley suggested:

> So going back to something that Tim said about possibly one blast a month. Again in our experience, and what we're looking at for the future goals of that mine, I would see it more as five blasts a year. Each time to you blast, you will get 15 to 20,000 ton of raw material that you blast, and then you manufacture that. You crush it up . . . . So I'm looking at more of five blasts a year.

*Id.* at 79a.

The Board granted its approval of the mine, with conditions, by decision dated February 24, 2021. The Board later issued a letter at Bishop Brothers' request, dated August 15, 2023, clarifying part of the Property was in the Woodland Conservation Zoning District, rather than the Agricultural Zoning District, and its conditional use

approval included the entire Property.  Landowners filed an appeal to the trial court.[1]

Bishop Brothers and Jeanette Minard, who owns the Property, intervened.[2]  The trial

court entered an order, dated June 25, 2024, memorializing the following agreement

between the parties:

> 2. The parties have agreed that Bishop Brothers met its burden with Athens Township as to its application for conditional use in both the agricultural zoning district and the woodland conservation zoning district by proving that the mining extraction plan complied with the specific requirements of the applicable ordinance, notwithstanding Bishop Brothers' failure to include in its application the fact that some portion of their project would occur in the woodland conservation zoning district, and subject to the [Landowners'] right at the upcoming hearing to present evidence in an effort to challenge the conditional use as to the woodland conservation zoning district only.
>
> 3. Accordingly, the [trial c]ourt's obligation at the evidentiary hearing will be limited to determining whether [Landowners] have met their burden to overcome the conditional use that was granted as to both zoning districts.  The parties generally agree that [Landowners] will need to establish that the mining project poses a substantial threat to the

---

[1] Landowners propose in their reply brief that the Board could not modify its grant of a conditional use because no appeal was taken within 30 days, and the Board's letter purporting to clarify that its approval applied to part of the Property in the Woodland Conservation Zoning District was really a new conditional use approval that was void *ab initio* because of the Board's failure to follow proper procedures.  Landowners' Reply Br. at 4-7.  On appeal before the trial court, Landowners objected to a remand or any further consideration of this case by the Board.  *See* Landowners' Br. at 5.  The parties instead agreed to a hearing before the trial court, which we summarize below.  Landowners do not dispute that the hearing before the trial court remedied any procedural deficiencies relating to the Board's letter.  *See In Re: McGlynn*, 974 A.2d 525, 532 (Pa. Cmwlth. 2009) (holding reversal of a conditional use grant was unnecessary despite the failure to strictly comply with public notice requirements "where [the o]bjectors received all process due and asserted no claim of prejudice or harm").

[2] Before the trial court, the parties stipulated that Landowners owned land near the Property and, thus, had standing to appeal.  The parties stipulated several other appellants did not have standing.  Although the parties agree Daniel Blackman and Kristi J. Blackman have standing, they did not appeal to this Court and instead filed a statement indicating they have no interest in the outcome of the appeal.

3

public health, safety, and welfare of the community that exceeds the impact that would normally be expected with such conditional use.

. . . .

5. The parties agree that consideration of the project by [the Department of Environmental Protection] can move forward so long as such consideration is limited to the agricultural zoning district. To the extent Bishop Brothers decides to move forward with the project in the agricultural zoning district, it does so being fully aware of the possibility that the conditional use would not be formally granted as to the woodland conservation zoning district if [Landowners] meet their burden at the upcoming hearing.

R.R. at 439a-40a.

The trial court held the hearing on September 19, 2024. Landowners focused their challenge on blasting that would occur at the mine, less than one half of a mile from a Department of Veterans Affairs outpatient clinic (VA Clinic) and a middle school. Landowners presented expert witness, William Thornton (Thornton), the owner and principal of "a consulting engineering firm specializing in physical acoustics, noise control, and mechanical vibration." R.R. at 934a. Based on his modeling, Thornton predicted the general operations at the mine, such as "digging, extraction, conveying, transporting, crushing and screening, and stockpiling" would result in "sound levels in the community" from 40 to 65 decibels depending on proximity.[3] *Id.* at 959a. By comparison, he testified "[t]ypical ambient noise" in the community will often range from 55 to 60 decibels during the day. *Id.* at 956a.

---

[3] Thornton explained that "every time a noise gets [10] decibels louder, we perceive it as twice as loud. It's like turning your stereo volume up from 5 to 10." R.R. at 956a.

4

Thornton further predicted blasting at the mine would result in sound levels of 112 decibels outside the VA Clinic and 79 or 80 decibels inside the VA Clinic.[4] R.R. at 948a. Thornton described the way a person outside the VA Clinic would perceive the sound:

> [W]hat it in essence will sound like is an explosion at some distance. People will hear what sounds like a . . . a loud firework explosion. Uh, along with the sound perception, people would feel the concussion. Uh, you typically feel it as a blast wave propagating through your chest and abdomen. It would feel like exactly what it is - an explosion. It would sound like exactly what it is - an explosion. And . . . and the loudness of the intensity is simply gonna be proportional to the distance away from that explosion.

*Id.* at 955a. Thornton also predicted the sound levels that blasting at the mine would cause at the two closest schools, which included the middle school and an elementary school. Thornton predicted sound levels of 110 decibels outside the middle school[5] and 82 decibels inside the middle school. *Id.* at 948a-49a. He predicted sound levels of 108 decibels outside the elementary school and 77 decibels inside the elementary school. *Id.*

Thornton testified the American Institute of Architects publishes standards for sound levels in schools, which provide for "limiting background noise roughly to 40 to 45 decibels." R.R. at 977a. Moreover, he explained the standards for healthcare facilities that serve "sound sensitive patients . . . are roughly similar to some of the

---

[4] Thornton predicted the sound level of blasting at the mine using "unweighted decibels." R.R. at 966a. He explained this was consistent with "a US International Standard . . . that actually dictates which decibel should be used for different measures for unity, that standard stipulates that in cases of transient and impulsive community noise, we use the unweighted peak sound pressure." *Id.* Thornton used "A weighted decibels" to predict the sound level of the mine's general operations. *Id.* It appears "A weighted decibels . . . reject[] low frequency noise." *Id.*

[5] Thornton testified blasting would likely sound the same outside the VA Clinic and middle school because an average person cannot perceive changes of less than three decibels. R.R. at 958a.

school guidelines . . . anywhere from 35 to 45 decibels." *Id.* at 977a-78a. Thornton explained individuals with post-traumatic stress disorder (PTSD) or autism spectrum disorder "are typically far more sound sensitive and often noise guidelines to protect those people from the noise impact are even lower. Sometimes it's . . . 25 to 35, 40 decibels in interior spaces." *Id.* at 974a.

In response to questioning from the trial court and from Landowners' counsel, Thornton compared the sound of blasting at the mine to the sound of a gunshot. He explained "a shotgun, a large 12 gauge shell fired at the mine blasting site is roughly 80 to 90 decibels at the VA [Clinic]." R.R. at 978a. Thornton explained "the average person, especially an adolescent student or younger would not be able to differentiate . . . [a] gunshot if heard on campus and a blasting noise in a mine," because the two would "sound very similar." *Id.* at 980a.

Additionally, Landowners presented the testimony of Brian Mounts (Mounts). Mounts testified he served in the United States Army for 18 years before retiring for medical reasons and now receives treatment at the VA Clinic. R.R. at 982a-84a. He attends appointments at the VA Clinic every six months and on an as-needed basis. *Id.* at 990a. Mounts testified he was an infantryman, experienced numerous injuries, and suffers from PTSD.[6] *Id.* at 982a-84a. He explained the "biggest trigger event" for his PTSD was an incident during which his vehicle "hit . . . about 1000 pounds of homemade explosives," which threw the vehicle 30 feet into the air and left a large crater. *Id.* at 990a. Mounts agreed explosions can trigger his PTSD, describing his reaction in such situations as follows:

> The first thing that I feel is generally . . . a sudden surge of adrenalin[e]. . . . [I]t's like the equivalent of getting scared really bad,

---

[6] Mounts testified he knows another veteran with PTSD who treats at the VA Clinic. R.R. at 989a-90a.

um where your heart seems to stop and at the same time sinks into the pit of your stomach, um and you can either have a freeze moment, a fight moment, or a flee moment. Um, you never know what to expect in relation to all the times that I was blown up, driving down the road. . . .

. . . .

It does differ. Ah, at least, again for myself, um there are other effects that it can have . . . I've had a headache since 25, July, 2009, um at about 8:00 in the morning, it's never gone away. Sometimes it get[s] worse, especially when I get those sudden surges of adrenaline, when something does happen. Um, I'll feel intense pressure in the back of my head. Um, it can cause physical pain in ways not really anticipated, if that makes sense. . . .

. . . .

- it's, it's the same spot that I hit, um when I was blown up. . . . I don't know if anybody's ever experienced 1000 pounds of explosives going off under your feet, but that force just keeps going. It does[n't] stop just because you hit one time. Um, and it forced my head, my neck, and my back all at the same time into the roof of the vehicle that . . . I was riding in. Um, so I will get, like your muscles will tense up, um everything is, like I said, everything is just high, everything is just going. Um, it's almost like . . . experiencing an ambush all over again. And, I know that there's not a lot of people that can say what that's like. Um, and I'm glad for that. I truly am. Um, but it's, it brings everything back. And, it depends on how well you can control yourself. Sometimes you can, you can take a second and you can try to do some breathing and you can try to [d]o some things to calm yourself back down, ah other times it's out the window. And it's just hit or miss.

*Id.* at 985a-88a. However, Mounts explained any "[l]oud sudden noises" can trigger his PTSD, and "somebody dropping a book on the rail here would be enough." *Id.* at 995a. Mounts acknowledged he owns firearms and goes target shooting about once a year "just more to re-zero everything." *Id.* at 992a.

The trial court also heard testimony from two parents with children that attend schools near the mine. Matthew Lantz testified the noise "could be a distraction for

not only my child but the rest of the school population." R.R. at 1001a. In addition, Timothy Derrig (Derrig) testified he has a child with "a very mild case of" attention deficit hyperactivity disorder and another, younger child who is "highly autistic." *Id.* at 1004a. Regarding blasting noise, Derrig explained he was primarily concerned about the disruption this might cause to his younger child. *Id.* at 1005a-06a.

By order dated November 7, 2024, the trial court denied Landowners' appeal.[7] Preliminarily, the trial court deemed it noteworthy that no one from the VA Clinic or the local schools testified at the hearing. R.R. at 472a. The trial court reasoned that "[h]ad an administrator, teacher, board member, doctor, nurse, or aide believed the mine was going to adversely impact their students or patients, they could have joined this lawsuit or testified about their concerns." *Id.* Moreover, the trial court explained Thornton's testimony supported "the common-sense conclusion that the noise of the anticipated mining blast is like a loud fireworks explosion or gunshot, depending on your distance." *Id.* at 473. The trial court reasoned:

> In this rural community, where children often go hunting or at least are familiar with the sound of distant shotgun or rifle blasts, Mr. Thornton's testimony that the sound of the blasting at the mine would be analogous to the sound of a distant gunshot supports a finding that mining, with [Department of Environmental Protection]-regulated blasting, will not cause undue harm to kids during their school day.

> The same is true for the VA patients, some of whom, like veteran . . . Mounts, may suffer from mental or emotional difficulties such as PTSD. As difficult as life may be for those who suffer from PTSD, and recognizing that, as Mr. Mounts testified, unanticipated noises may very well trigger unpleasant and unwanted symptoms, such triggering noises may be as minimal as, according to Mr. Mounts, a cup [sic] falling off a table onto the carpeted floor. In some respects, the regular noise of mining operations occurring at a mining site nearly half a mile

---

[7] The trial court also denied a motion for contempt Bishop Brothers filed, which is not relevant to our disposition of this appeal.

8

away may be more predictable, and therefore less alarming. As Mr. Mounts testified, he is able to routinely discharge his various firearms during target practice, apparently without detriment. While recognizing the seriousness of the mental health needs and conditions of all VA patients who suffer from such maladies, the impact of the mine on such patients is, without question, speculative at best.

*Id.* at 474a.[8]

Landowners timely appealed to this Court. On appeal, Landowners challenge the trial court's description of Mounts' testimony as "speculative." Landowners' Br. at 15-29. They describe the testimony as "specific, experience-based evidence about the effect that the explosive blasting at the proposed hard-rock mine will have." *Id.* at 15. Landowners argue there are likely other veterans who receive treatment at the VA Clinic and, like Mounts, suffer from explosion-triggered PTSD. *Id.* at 25, 28. In addition, Landowners emphasize blasting will occur near schools and result in sound "above recommended interior levels." *Id.* at 15, 21-29. Landowners cite to Derrig's concerns about the disruptive effect of blasting noise. *Id.* at 24.

---

[8] The trial court issued an opinion that further explained its reasoning in response to Landowners' concise statement of errors complained of on appeal:

> The point is, Mr. Mounts' symptoms are real, and he takes steps to manage them. In an unpredictable world that does not yet include the proposed surface mine, but does include plenty of triggering events, [Landowners] simply did not establish that the possibility of an ill-timed blast and the possibility of an adverse reaction are sufficiently certain enough to conclude that the impact of this proposed mine on VA patients is beyond speculation. More to the point, [Landowners] have failed to demonstrate the mine presents a substantial threat to the health, safety, or welfare of the community - a community that includes VA patients who occasionally treat at the clinic - that exceeds the impact that would ordinarily be expected.

R.R. at 1055a.

## DISCUSSION

Where the trial court does not take additional evidence, this Court reviews the decision of *the Board* to determine whether it committed an abuse of its discretion or error of law. *Harvin. v. Bd. of Comm'rs of Upper Chichester Twp.*, 33 A.3d 709, 713 n.7 (Pa. Cmwlth. 2011). Where the trial court takes additional evidence, however, it exercises *de novo* review, and we must review whether *the trial court* committed an abuse of its discretion or error of law. *Newtown Square E., L.P. v. Twp. of Newtown*, 38 A.3d 1008, 1012 n.5 (Pa. Cmwlth. 2011). Finally, in cases like this one, where the trial court takes additional evidence on a specific issue, the trial court "may consider only that specific issue *de novo*." *Sowich v. Zoning Hearing Bd. of Brown Twp.*, 214 A.3d 775, 783 n.6 (Pa. Cmwlth. 2019).

The controlling issue on appeal is whether Landowners successfully rebutted Bishop Brothers' evidence that it was entitled to conditional use approval to operate a mine. "A conditional use is one that has been legislatively approved for a particular zoning district, so long as the proposed use satisfies the standards for such a use set forth in the zoning ordinance." *HHI Trucking & Supply, Inc. v. Borough Council of Borough of Oakmont*, 990 A.2d 152, 159 (Pa. Cmwlth. 2010). We have summarized the burden of proof in conditional use proceedings as follows:

> The applicant bears the burden of establishing that the proposed conditional use satisfies the specific criteria in the zoning ordinance. The board is the factfinder, with the responsibility for credibility determinations and the weight to be assigned the evidence. If the board is persuaded that the application complies with the zoning ordinance, a presumption arises that the proposed use is consistent with the general welfare of the community. A conditional use evidences a legislative determination that the use will not have an adverse impact on the public interest in normal circumstances.
>
> The burden then shifts to [the] objectors to rebut the presumption by proving that there is a high degree of probability the proposed use

10

will adversely affect the welfare of the community in a way not normally expected from the type of use. Mere speculation of possible harm is not sufficient, and the objectors' burden may not be satisfied with personal opinion or bald assertions. Pointedly, a conditional use application *must* be granted unless the objectors present sufficient evidence that the proposed use has a detrimental effect on the public health, safety and welfare.

*Brookview Solar I, LLC v. Mount Joy Twp. Bd. of Supervisors*, 305 A.3d 1222, 1233 (Pa. Cmwlth. 2023) (citations and quotation marks omitted, alteration and emphasis in original).

This Court is not unsympathetic to the concerns that Landowners have raised regarding the effect that blasting noise from the mine may have on veterans receiving treatment at the VA Clinic or on children who attend local schools. However, we cannot conclude that noise is the type of adverse effect "not normally expected" from a mine, or that the adverse effect of noise from the mine will exceed what might normally be expected. *See Brookview Solar,* 305 A.3d at 1233; *McGlynn*, 974 A.2d at 537 (explaining a conditional use should be denied if "the adverse impact on the public interest exceeds that which might be expected in normal circumstances").

Landowners suggest the community in this matter is more vulnerable to noise from blasting because of the mine's proximity to the VA Clinic and multiple schools. Landowners' Br. at 22-23. Testimony before the Board indicated[9] Bishop Brothers planned to engage in blasting only once per month and possibly as little as five times per year. R.R. at 59a, 79a. Mounts testified he attends appointments at the VA Clinic every six months and on an as-needed basis, which indicates it would be unlikely for Mounts to be at the VA Clinic at the same time as a blast. *Id.* at 990a. Moreover, the

___

[9] The Board made no findings about the frequency of blasting but included a condition that "[n]o blasting shall be conducted except[] between the hours of 7:00 a.m. and 5:00 p.m., Monday through Friday. No blasting shall be permitted on any weekend or any of the [13] Federal holidays." R.R. at 15a.

11

infrequency of blasting belies Landowners' claim that the noise would be a persistent disruption to school students.

Regardless of how frequently blasting will occur at the mine, the record offers little frame of reference for how disruptive that blasting will be. Thornton provided the decibel levels for ambient noise in the community and the sound of blasting at the mine. R.R. at 948a-49a, 956a. He explained loudness doubles with every 10 decibels and compared the sound of blasting to a gunshot. *Id.* at 956a, 978a. Landowners did not elicit any other useful comparisons or examples from Thornton that would assist the trial court in finding that a distant blast, heard only rarely, would have an adverse effect on the community.

Landowners contend the testimony before the Board should not be considered in this appeal.[10] Even accepting their position for the sake of argument, our review of

_____

[10] Landowners assert that "[n]o stipulation or other court order incorporated the 2021 [r]ecord into this case, or otherwise provided that it would constitute substantive evidence in the 2023 appeal." Landowners' Reply Br. at 7. On appeal before the trial court, Landowners objected to any further consideration of this matter by the Board. Landowners then "agreed that Bishop Brothers met its burden . . . as to its application for conditional use," and that the trial court would conduct a hearing "limited to determining whether [Landowners] have met their burden to overcome the conditional use." R.R. at 439a-40a. Simply stated, Landowners cannot agree Bishop Brothers met its burden of proof in this case by presenting certain evidence and later insist that evidence is not a part of the record. We observe the transcript of the trial court's hearing suggests the trial court and the parties understood the agreement to incorporate the record from the February 24, 2021 decision:

> [Counsel for Athens Township]: One additional issue, Your Honor. I just feel - uh, it's incumbent upon - uh, the Township to ensure that the Court is aware that in the decision that was reached, there were various conditions that were placed upon the applicant. . . . I have a copy of that decision with those conditions if the Court would be inclined to consider those at this time.
>
> . . . .
>
> [Counsel for Bishop Brothers:] I . . . I believe that's all part of the record that's already . . .

**(Footnote continued on next page…)**

12

the record does not reveal Landowners presented any evidence before the trial court regarding the frequency or duration of blasting. Without this important evidence, we agree with the trial court that any conclusion regarding the effect of blasting noise on the community would be speculative, and that Landowners did not meet their burden on rebuttal.[11]

---

. . . .

[Counsel for Bishop Brothers:] . . . is already before the Court. I mean, I don't - if we do need to stipulate that that record is - already you have that - I . . . I would . . . I would ask that that be stipulated to that, but I believe by agreeing that - in paragraph 2 - that we've already agreed to that. Would you agree?

THE COURT: I think that's right. . . .

*Id.* at 816a-17a.

[11] We note Department of Environmental Protection regulations for noncoal mining require Bishop Brothers to publish a blasting schedule, and a detailed schedule may help veterans who attend the VA Clinic, families of schoolchildren, and the community as a whole to minimize harmful effects or disruption that blasting may cause:

(a) *Blasting schedule publication.*

(1) Copies of the schedule shall be distributed by mail to local governments and to public utilities within 1000 feet of the blasting area.

(2) A person who conducts surface mining activities shall publish a blasting schedule in a newspaper of general circulation in the locality of the proposed site at least 10 days before beginning a blasting program in which blasts that use more than 5 pounds of explosive or blasting agents are detonated.

(3) The person who conducts the surface mining activities shall republish the schedule at least every 12 months.

**(Footnote continued on next page…)**

13

## CONCLUSION

The trial court did not abuse its discretion or err in deciding that Landowners failed to establish blasting noise from Bishop Brothers' mine would adversely affect the welfare of the community in a way not normally expected from that type of use. *See Brookview Solar,* 305 A.3d at 1233. Therefore, we affirm the trial court's November 7, 2024 order.

_____
STACY WALLACE, Judge

---

(b) *Blasting schedule.* The blasting schedule shall include the following:

. . . .

(2) The days and time periods when explosives are to be detonated.

. . . .

(5) A description of possible emergency situations that might prevent blasting at times announced in the blasting schedule, such as rain, lightning, other atmospheric conditions or operator or public safety which may require unscheduled detonation.

25 Pa. Code § 77.563(a)-(b).

14

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Daniel Blackman, Kristi J. Blackman,   :
Donald L. Weaver, Garrett L. Weaver,   :
Chad T. Struble, Josh N. Rumpff, and   :
Rachael L. Rumpff   :
  :
        v.   : No. 1674 C.D. 2024
  :
Athens Township, Bishop Brothers   :
Construction Co., Inc., and Jeanette H.   :
Minard   :
  :
Appeal of: Donald L. Weaver, Garrett   :
L. Weaver, Josh N. Rumpff, Rachael L.   :
Rumpff, and Chad T. Struble   :

# **O R D E R**

    **AND NOW**, this 9th day of April 2026, the order of the Bradford County Court of Common Pleas, dated November 7, 2024, is **AFFIRMED**.

 

_____
STACY WALLACE, Judge